UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO. 00-6188-CIV-DIMITROULEAS
Magistrate Judge Johnson

RUPARI FOOD SERVICES, INC., a
Florida corporation,

       Plaintiff,

vs.

SPARTA FOODS, INC., a Minnesota
corporation,

       Defendant .
_____/



# SPARTA'S MEMORANDUM RESPONDING TO
# RUPARI'S MEMORANDA OPPOSING TRANSFER OR DISMISSAL

## INTRODUCTION

    Defendant Sparta Foods, Inc. ("SPARTA"), submits this memorandum in response to RUPARI's memoranda opposing SPARTA's motion to dismiss this action and transfer it to the United States District Court for the District of Minnesota. Because the Minnesota Court was the first to obtain jurisdiction over the subject matter and the parties, the principle of comity requires that the Minnesota Court have priority to decide this dispute.

    This Court's February 8, 2000, Order to Plaintiff to Show Cause directed RUPARI to respond to SPARTA's motion to dismiss by February 17, 2000. The Order also requested RUPARI to address whether transfer to the District of Minnesota, rather than dismissal, may be warranted.

MARLOW, CONNELL, VALERIUS, ABRAMS, ADLER & NEWMAN



CASE NO. 00-6188-CIV-DIMITROULEAS
Magistrate Judge Johnson

The issues before this Court are identical to the issues raised by RUPARI's

Minnesota counsel in the case SPARTA brought against RUPARI in the United States

District Court for the District of Minnesota (Court File No. 99-CV-2041). RUPARI's motion

to dismiss SPARTA's complaint is currently pending before Judge Michael Davis of that

Court. SPARTA has filed an extensive Memorandum in Opposition to [RUPARI's] Motion

to Dismiss [SPARTA's] Complaint. That memorandum contains an extensive statement

of the facts, with supporting affidavits, and SPARTA's arguments demonstrating the

Minnesota Court's jurisdiction over RUPARI. It also addresses RUPARI's alternative

dispute resolution contentions. That memorandum is attached hereto and made a part

hereof for the Court's review.

## I.   THE ISSUES RAISED BY RUPARI IN ITS MEMORANDA ARE ALREADY PENDING BEFORE JUDGE DAVIS.

Pursuant to the doctrine of comity, federal courts generally refrain from interfering

with each other's affairs. *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.,* 342 U.S. 180, 72

S.Ct. 219, 96 L.Ed. 200 (1952). The primary purpose of the rule is to conserve judicial

resources and to avoid conflicting rulings. *Allstate Ins. Co v. Clohessy*, 9 F.Supp 2d 1314,

1315 (M.D. Fla 1998).

In the memoranda it submitted to this Court, RUPARI argues that this Court should

not dismiss or transfer this case to Minnesota because: (1) SPARTA's Minnesota lawsuit

is premature; (2) SPARTA filed the Minnesota case in bad faith; and (3) the Minnesota

court does not have jurisdiction over RUPARI. In its motion to dismiss the Minnesota

2

MARLOW, CONNELL, VALERIUS, ABRAMS, ADLER & NEWMAN

CASE NO.  00-6188-CIV-DIMITROULEAS
Magistrate Judge Johnson

action, Minnesota counsel for RUPARI raised the very same issues, arguing that the Minnesota case should be dismissed because SPARTA did not comply with the ADR provision of the parties' supply Agreement ("Agreement"), and that the Minnesota court did not have jurisdiction over RUPARI.  Thus, the very issues that RUPARI has raised before this Court are currently pending before Judge Davis in Minnesota.  There is no reason for two courts to decide a single set of issues.

## II.  THE FIRST-FILED RULE FAVORS TRANSFERRING OR DISMISSING THIS ACTION.

For the reasons noted above, this Court does not need to address the substantive allegations of RUPARI's motion.  In any event, the first-filed rule favors transferring or dismissing this action.  The first-filed rule holds that when parties have instituted competing or parallel actions in courts of concurrent jurisdiction, the court initially having jurisdiction should hear the case.  *Supreme Intern. Corp. v. Anheuser-Busch, Inc.*, 972 F. Supp. 604, 606 (S.D. Fla. 1997).  The primary purpose of the rule is to conserve judicial resources and to avoid conflicting rulings.  *Allstate Ins. Co v. Clohessy*, 9 F.Supp.2d 1314, 1315 (M.D. Fla 1998).  "In the absence of compelling circumstances, the court initially seized of a controversy should be the one to decide the case."  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Haydu*, 675 F.2d 1169, 1174 (11th Cir.1982); *see also Midwest Motor Express, Inc. v. Central States, S.E.*, 70 F.3d 1014, 1017 (8th Cir. 1995)(the first court in which jurisdiction attaches has priority to decide the case).  Generally where a claim is filed in one court and the defendant in the action, instead of asserting a counterclaim, institutes a second action in which that counterclaim is the basis of the complaint, the court in which

3

CASE NO.  00-6188-CIV-DIMITROULEAS
Magistrate Judge Johnson

the second claim is filed will either dismiss the action or stay it pending resolution of the first action.  *Southmark Corp v. PSI, Inc.,* 727 F. Supp. 1060, 1062 (S.D. Miss. 1989).

Thus, the question of whether RUPARI's claims in this action should be asserted as counterclaims is important.  Rule 13(a) of the Federal Rules of Civil Procedure provides in part:

> **(a) Compulsory Counterclaims**.  A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

The dispute between the SPARTA and RUPARI arises from their Agreement. SPARTA has alleged in the Minnesota case that RUPARI breached its obligations under the Agreement by failing to order the amount of product required, and by failing to pay for the product it did order.  In this action, RUPARI has alleged that SPARTA breached an implied warranty and committed fraud with respect to the product that SPARTA produced for RUPARI pursuant to the Agreement.  The parties' relationship is governed by the Agreement.  Both actions arise out of the parties' obligations under the Agreement.  Both actions involve the same parties, the same Agreement, the same product, and the same issues.

In light of the facts underlying the dispute between the parties, RUPARI's argument that its claims are not related to SPARTA's Minnesota claims rings false.  RUPARI's efforts to plead around the warranty provision of the Agreement, and to argue around the

4

CASE NO.  00-6188-CIV-DIMITROULEAS
Magistrate Judge Johnson

Minnesota choice of law provision, do not alter the fact that RUPARI's claims arise from the relationship governed by the Agreement.  Therefore, RUPARI's claims are counterclaims, the first-filed rule should be applied, and this action should be either dismissed or transferred.

### III.    RUPARI HAS NOT SUBMITTED SUFFICIENT EVIDENCE OF COMPELLING CIRCUMSTANCES TO JUSTIFY IGNORING THE FIRST-TO-FILE RULE.

In instances involving compelling circumstances, courts may ignore the first-to-file rule.  RUPARI argues that SPARTA acted in bad faith, and that SPARTA's bad faith conduct provides the compelling circumstance necessary to ignore the first-filed rule. RUPARI's argument is not supported by law or fact.

### A.    Rupari misstated the facts.

RUPARI's argument is built on its recitation of facts, which is deficient for two major reasons:  (1) the facts alleged are not based on affidavits or declarations; and (2) many of the facts alleged in RUPARI's memoranda are either false or misleading.  The three examples noted below both clarify the record and demonstrate RUPARI's carelessness. They are by no means an exhaustive exposition of RUPARI's misstatements of fact.

1.    Rupari does not accurately describe the nature of the initial relationship between SPARTA and Rupari.

RUPARI contends that SPARTA initiated and pursued the relationship and that SPARTA sought an opportunity to visit RUPARI in Florida.  In fact, RUPARI aggressively pursued a relationship with SPARTA and RUPARI invited SPARTA to Florida.  See ¶¶ 7-8 of the Affidavit of Joel Bachul dated February 18, 2000, submitted in support of SPARTA's

5

MARLOW, CONNELL, VALERIUS, ABRAMS, ADLER & NEWMAN

CASE NO.  00-6188-CIV-DIMITROULEAS
Magistrate Judge Johnson

memorandum in opposition to RUPARI's motion to dismiss the Minnesota action (hereinafter "First Bachul Aff.").

        2.   <u>Rupari did not complain about the product when the product was delivered</u>.

RUPARI would have this Court believe that after the parties executed the Agreement in May 1999, RUPARI ordered some product for its customers and that, shortly after the product was delivered, RUPARI customers began complaining about the product. RUPARI's description of the events is wrong. RUPARI began to order the product in March 1999, two months before the Agreement was executed. <u>See</u> ¶ 3 of the Affidavit of Joel Bachul dated March 2, 2000, (hereinafter "Second Bachul Aff.") Product was shipped in March, April, May, June, July, August, and September, 1999. <u>Id.</u> The Agreement required RUPARI or its customers to inspect the product within seven days of delivery and to notify SPARTA of any alleged breaches of the warranties set out in the Agreement. First Bachul Aff., Exh. B, ¶¶ 6.2, 7.2. Notwithstanding the foregoing, RUPARI first notified SPARTA of a single complaint regarding the cheese in late September 1999. Second Bachul Aff., ¶ 4.

RUPARI did not provide written notice of complaints with respect to the cheese until October 19, 1999, when RUPARI sent SPARTA a letter in which it claimed that it could no longer use the cheese cups that it had in stock due to "customer complaints." <u>Id.</u>, Exh A. In the October 19, 1999, letter, RUPARI did not identify the alleged customers who complained or the lot number of the cheese cups that were allegedly defective, did not

6

MARLOW, CONNELL, VALERIUS, ABRAMS, ADLER & NEWMAN

CASE NO.  00-6188-CIV-DIMITROULEAS
Magistrate Judge Johnson

return the allegedly defective cheese cups, and did not describe the alleged problem with the product.  Id.

On December 21, 1999, after SPARTA had formally notified RUPARI of RUPARI's breaches of its obligations under the Agreement, RUPARI sent a December 21, 1999, letter to SPARTA but did not specify that the product provided by SPARTA was in any way defective or non-conforming.  Id., Exh. B.  Rather, the letter stated that RUPARI would not use the cheese cups because of "numerous customer complaints."  Id.

3.    Rupari mischaracterized the October 21, 1999, meeting.

RUPARI implies that SPARTA invited RUPARI to Minnesota in October 1999 solely to resolve the alleged defective product problem.  In fact, the October 21, 1999, meeting was intended to address all outstanding issues, including RUPARI's failure to comply with its obligations under the Agreement.  Id., ¶ 7.

4.    Rupari's had substantial contact with Minnesota.

RUPARI contends that it had minimal contact with Minnesota.  A description of RUPARI's contacts with Minnesota is contained in SPARTA's memorandum submitted in opposition to RUPARI's motion to dismiss the Minnesota action.

**B.    Sparta did Not file the Minnesota case in bad faith.**

RUPARI's bad faith argument rests on its allegation that SPARTA sued RUPARI in contravention of the Agreement's ADR provision.  SPARTA's service and filing of the Minnesota case must be placed in context. In the summer of 1999, it became apparent that RUPARI was not complying with its obligations under the Agreement.  It had not ordered

7

MARLOW, CONNELL, VALERIUS, ABRAMS, ADLER & NEWMAN

CASE NO.  00-6188-CIV-DIMITROULEAS
Magistrate Judge Johnson

the 2,000,000 packages of product that it was obligated to order and, to make matters worse, RUPARI was not paying the amounts that it owned SPARTA. SPARTA initially tried to resolve the matter informally.

By the mid-November 1999, it became clear that RUPARI was not going to comply with its obligations under the terms of the Agreement. Therefore, on November 18, 1999, SPARTA provided RUPARI with written notice of RUPARI's breaches of the Agreement, and granted RUPARI thirty days to cure the breaches. *See* Exhibit A to Affidavit of David Meyer dated February 18, 2000, submitted in support of SPARTA's memorandum in opposition to RUPARI's motion to dismiss the Minnesota action (hereinafter "Meyer Aff.") The ADR provision of the Agreement provides that in the event of a dispute, a party seeking to initiate ADR shall give written notice of the dispute to the other party. In the November 18, 1999, notice, SPARTA also requested that the parties participate in ADR. First Bachul Aff., Exh. B, ¶ 13.2.i.

The ADR provision of the Agreement requires the parties to meet promptly, but in no event later than thirty days from the date of the notice. Id., Exh. B., ¶ 13.2.ii. The Agreement further provides that if the dispute is not resolved within thirty days of the initial meeting, either party may request that the ADR be ended, and the parties may then pursue all available remedies. Id.

Shortly after SPARTA provided RUPARI with the notice, Sheldon Burnett, then counsel for RUPARI, telephoned David Meyer, counsel for SPARTA. Meyer Aff., ¶ 3. Meyer and Burnett agreed that the parties would meet through a telephone conference on

8

MARLOW, CONNELL, VALERIUS, ABRAMS, ADLER & NEWMAN

CASE NO.  00-6188-CIV-DIMITROULEAS
Magistrate Judge Johnson

December 22, 1999.  Id. ¶ 4.  On December 20, 1999, Burnett and Meyer again spoke on

the telephone.  Id. ¶ 11.  Burnett indicated that he could not participate in the telephone

conference that was scheduled for December 22, 1999, and requested that the telephone

conference be continued to January 6, 2000.  Id.  Meyer agreed to postpone the telephone

conference, but clearly indicated that by agreeing to postpone the conference, SPARTA

was not waiving any applicable time limits, and that SPARTA would take the steps

necessary to protect its rights under the Agreement.  Id.  Meyer confirmed this in a letter

to Burnett dated December 21, 1999, which provided "[p]lease be advised that my

agreement to reschedule the telephone conference did not waive or extend any time

limitations that may be applicable to this dispute, and that SPARTA will continue to take

the steps necessary to enforce its right under the parties' Supply Agreement."  Id., Exh. B.

Also on December 21, 1999, because RUPARI had not cured the breaches noted in the

November 18, 1999, letter, SPARTA terminated the Agreement.  Id., Exh. C.

Under the terms of the Agreement, RUPARI and SPARTA were required to meet

within thirty days of November 18, 1999.  First Bachul Aff., Exh. B., ¶ 13.2.ii.  RUPARI did

not make itself available to do so.  Thus, the ADR provision ended when RUPARI failed

to meet with SPARTA within the thirty-day period, and SPARTA was free to pursue it

rights.  To enforce its rights, SPARTA filed suit in the United States District Court for the

District of Minnesota.  SPARTA specifically informed RUPARI that it was not extending any

time limits and that it would take the steps necessary to protect its rights.

9

MARLOW, CONNELL, VALERIUS, ABRAMS, ADLER & NEWMAN

CASE NO.  00-6188-CIV-DIMITROULEAS
Magistrate Judge Johnson

Nonetheless, RUPARI claims that it SPARTA filed the suit in bad faith because SPARTA did not comply with the terms of the Agreement.  RUPARI's argument, in light of its own conduct, is at best hypocritical.  While SPARTA complied with the terms of the Agreement before it sued RUPARI, RUPARI complied with none of the terms of the Agreement before it sued SPARTA.  RUPARI did not formally notify SPARTA of any breach of warranty, and did not formally invoke the ADR provision of the agreement.  If any party filed suit without complying with the terms of the Agreement, it was RUPARI, not SPARTA.

### C.    The case cited by Rupari is distinguishable.

RUPARI cites the case of *Southmark Corp v. PSI, Inc.*, 727 F. Supp. 1060 (S.D. Miss. 1989), in an effort to support its argument that the first filed rule should not be applied in this case.  In *Southmark*, a dispute arose between Southmark, a Mississippi corporation, and PSI, a Missouri corporation with its principal place of business in Nebraska.  After the dispute arose, the parties met on July 21.  After the meeting, counsel for Southmark informed counsel for PSI that PSI would have until August 4 to respond to a settlement proposal.  However, on July 20, PSI had already filed a declaratory judgment action in Nebraska.  Southmark filed an action seeking damages in Mississippi on July 31. Eventually, PSI moved the Mississippi court to dismiss or stay the Mississippi proceeding. The court held that PSI improperly denied Southmark of its right as a potential plaintiff to choose its forum, and that Southmark's conduct constituted a misuse of the Declaratory Judgment Act.  Accordingly, the court denied Southmark's motion.

10

MARLOW, CONNELL, VALERIUS, ABRAMS, ADLER & NEWMAN

CASE NO.  00-6188-CIV-DIMITROULEAS
Magistrate Judge Johnson

This case is easily distinguishable from *Southmark*.  First, for the reasons noted above, SPARTA did not act in bad faith.  SPARTA explicitly informed RUPARI by telephone and letter that by agreeing to postpone the telephone conference, it was not extending any applicable time limitations, and that it was going to take the steps necessary to protect its rights.

Second, in *Southmark*, the first case filed was a declaratory judgment action clearly designed to deprive the party with a claim for damages of its choice of forum.  The federal courts have specifically recognized that a court may depart from the first-filed rule where one party, on notice of a potential lawsuit, files a declaratory judgment action in its home forum.  *Supreme Intern Corp.*, 972 F. Supp. at 607.  The Minnesota case, unlike the case in *Southmark*, is an action for damages, and is not a declaratory judgment designed to deprive a plaintiff of its choice of forum.

## IV. NEITHER THE MERITS OF THE MINNESOTA CASE NOR THE PENDING MOTION TO DISMISS THE MINNESOTA ACTION ON JURISDICTIONAL GROUND SHOULD AFFECT THIS COURT'S APPLICATION OF THE FIRST TO FILE RULE.

RUPARI also argues that this Court should deny SPARTA's motion transfer because SPARTA's Minnesota suit is premature, and because the United States District Court does not have jurisdiction over RUPARI.  Neither argument has merit.

### A. This Court should not consider the merits of the Minnesota suit.

RUPARI urges this Court to deny SPARTA's motion because SPARTA's Minnesota suit is premature.  In essence, RUPARI asks this Court to make a determination regarding the merits of the Minnesota case, then use that determination as the basis to deny

11

CASE NO.  00-6188-CIV-DIMITROULEAS
Magistrate Judge Johnson

SPARTA's motion to transfer in this case.  In *Midwest Motor Express, Inc. v. Central States S.E.*, 70 F.3d 1014 (8th Cir. 1995), the Eighth Circuit rejected an identical argument.

In *Midwest Motor Express*, the defendant in the first-filed suit argued that because the plaintiff's claims in the first-filed suit were premature, and thus legally non-existent, the second-filed suit should not have been transferred to the forum of the first-filed suit.  In response to the argument, the Eighth Circuit held:

> Midwest thus asks this court to weigh the merit of the [first-filed] action in order to determine whether that forum has jurisdiction. But this is a non sequitur.  "A court may have jurisdiction over a case even though the case is one to which there is no merit….The jurisdiction of the federal courts is dependent on the subject matter of the action or the status of the parties to it; it is not dependent on the merits of the case."

Id. at 1017(quoting Charles A. Wright, Law of Federal Courts 31 (5th ed. 1994)). Accordingly, the Eighth Circuit rejected the argument and refrained from passing on the issue of whether the first-filed action was premature.  Id.  This Court should do the same.

### B.    Rupari's pending motion to dismiss the Minnesota action should not affect this Court's application of the first-to-file rule.

RUPARI similarly argues that this Court should deny SPARTA's motion to transfer because the United States District Court for the District of Minnesota does not have jurisdiction over RUPARI.  Questions regarding the jurisdiction of the first-filed court, like questions regarding the merits of the first-filed complaint, are best left to the court in which the case was filed.

In *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999), a defendant argued that the first-to-file rule should "include a precondition that requires the

12

**MARLOW, CONNELL, VALERIUS, ABRAMS, ADLER & NEWMAN**

CASE NO.  00-6188-CIV-DIMITROULEAS
Magistrate Judge Johnson

[court of the second filed action] to find proper jurisdiction in the first-filed court before

applying the rule at all."  Although the Court in *Cadle* noted that "jurisdictional certainty in

the first-to-filed rule might be a proper factor for a district court to weigh in maximizing

judicial economy," the Court held:

> The district court correctly refused to act as a "super appellate
> court" by entertaining either Cadle's jurisdiction or the
> defendants' standing arguments, and properly limited its
> inquiry to the potential overlap between the two cases.  By so
> limiting its analysis, the district court indeed avoided trenching
> on the authority of its sister court, one of "the very abuses the
> first-to-file rule is designed to prevent."

Id. at 606 (quoting *Cadle v. Whataburger of Alice, Inc.*, No. 97-1502, slip op. at 4(W.D. Tex.

1998).  It only makes sense that the Minnesota court should determine whether it has

jurisdiction of RUPARI.  *See  Chiron Corp. v. Advanced ChemTech, Inc.*, 869 F. Supp. 800

(N.D. Cal. 1994)(each court has jurisdiction to determine its own jurisdiction, but not the

jurisdiction of others).

Jurisdictional uncertainty, standing alone, does not provide a basis for departing

from the first-to-file rule.  *Brower v. Flint Ink Corp.*, 865 F. Supp. 564 (N.D. Iowa 1994);

*Berisford Capital Corp. v. Central States, Southeast and Southwest Areas  Pension Fund,*

677 F. Supp. 220 (S.D.N.Y 1988)("I would not conclude in the 'sound discretion' allotted

to me in this matter that [jurisdictional uncertainty in the first-filed court], standing virtually

alone, should be so compelling as to cause me to depart from the well-established and

salutary first-filed rule.").

MARLOW, CONNELL, VALERIUS, ABRAMS, ADLER & NEWMAN

CASE NO.  00-6188-CIV-DIMITROULEAS
Magistrate Judge Johnson

RUPARI relies on *Cessna Aircraft Co. v. Brown*, 348 F.2d 689 (10th Cir. 1965) and *Muller v. Walt Disney Productions*, 822 F. Supp. 1033 (S.D.N.Y. 1993) to support its position. RUPARI's reliance is misplaced. In *Cessna*, the Tenth Circuit simply fashioned a practical remedy for a procedural mess. It issued an order that stayed the second-filed action until the first-filed action, an action in which a motion to dismiss for lack of personal jurisdiction had been made, was resolved. Contrary to the implication of RUPARI, *Cessna* does not stand for the proposition that a court should deny a motion to transfer if there is uncertainty regarding the first-filed court's exercise of personal jurisdiction over the parties.

*Muller v. Walt Disney Productions* is distinguishable from the present case. The first-filed case in *Muller* was a declaratory judgment action in a forum that was not related to the substance of the dispute. After considering a number of factors, including the uncertainty regarding the jurisdiction of the court in which the first action was filed, the convenience of the parties, the connection of the action to the first-filed forum, the fact that the first action was a declaratory action, and the conduct of the plaintiff in the first-filed case, the *Muller* court denied the motion to transfer without prejudice. The facts of this case are not analogous to those of *Muller*. The Minnesota case is not a declaratory judgment action. SPARTA is a Minnesota corporation the Agreement calls for RUPARI's produce to be manufactured by SPARTA in Minnesota. SPARTA sold over $40,000 of RUPARI's product in Minnesota, and the Agreement specifies that Minnesota law is to govern.

14

MARLOW, CONNELL, VALERIUS, ABRAMS, ADLER & NEWMAN

CASE NO. 00-6188-CIV-DIMITROULEAS
Magistrate Judge Johnson

In any event, to the extent this Court decides to examine whether Minnesota has jurisdiction over RUPARI, the Court need only review the memorandum (attached hereto) submitted by SPARTA in opposition to RUPARI's motion to dismiss the Minnesota action. As is noted in that memorandum and its supporting affidavits, RUPARI's contacts with Minnesota are easily sufficient for the United States District Court for the District of Minnesota to exercise personal jurisdiction over RUPARI.

## V. NONE OF THE OTHER FACTORS NOTED BY RUPARI JUSTIFY IGNORING THE FIRST-TO-FILE RULE.

This motion to transfer is based primarily on the first-to-file rule. As is noted above, the first-to-file rule is generally applied absent compelling circumstances. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Haydu*, 675 F.2d 1169, 1174 (11th Cir.1982). Nonetheless, RUPARI contends that the convenience of the parties and the convenience of the witnesses weigh in favor of denying the motion to transfer.

At best, the convenience of the parties is a wash. Just as RUPARI is a Florida corporation, SPARTA is a Minnesota corporation. SPARTA's inconvenience and expense in litigating in Florida is equal to or will exceed any inconvenience that RUPARI will suffer as a result of the Minnesota litigation. The convenience of the witnesses is also at worst a wash. Just as RUPARI's witnesses are located in Florida, SPARTA's witnesses are located in Minnesota. In addition, RUPARI's alleged counterclaim calls into question the quality of the cheese cups manufactured in Minnesota. Finally, the Agreement provides that it shall be governed by Minnesota law. This weighs in favor of transferring the action.

15

MARLOW, CONNELL, VALERIUS, ABRAMS, ADLER & NEWMAN

CASE NO.  00-6188-CIV-DIMITROULEAS
Magistrate Judge Johnson

## CONCLUSION

For the foregoing reasons, SPARTA respectfully request the Court to transfer the

instant case to Judge Davis in Minnesota.

Dated: March 3, 2000.

Respectfully submitted,

MARLOW, CONNELL, VALERIUS,
ABRAMS, ADLER & NEWMAN
2950 Southwest 27th Avenue, Suite 200
Post Office Box 339075
Miami, Florida  33233-9075
Direct Line:  (305) 460-6537

Attorneys for Sparta Foods, Inc.

\

By:_____

**MICHAEL C. ROTUNNO**
**Fla. Bar No.: 0861979**

By:_____

**William G. Liston**
**Fla. Bar No.: 332542**

16

MARLOW, CONNELL, VALERIUS, ABRAMS, ADLER & NEWMAN

CASE NO.  00-6188-CIV-DIMITROULEAS
Magistrate Judge Johnson

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served on March 3, 2000 via certified return receipt to:

ARNOLD D. SCHATZMAN, ESQ.
Schatzman & Schatzman, P.A.
Suite 700, Dadeland Towers North
9200 South Dadeland Boulevard
Miami, Florida 33156

Attorney for Plaintiffs

MARLOW, CONNELL, VALERIUS
  ABRAMS, ADLER & NEWMAN
2950 Southwest 27th Ave. Ste. 200
Post Office Box 339075
Miami, Florida 33233-9075
Direct Line: (305) 460-6537
Attorneys for Sparta Foods, Inc.

By:_____
   **MICHAEL C. ROTUNNO**
   **Fla. Bar No.: 0861979**

I:\ROTUNNO\Rupari Food\Pleadings\Federal Court\MEMO.RESP\bl

MARLOW, CONNELL, VALERIUS, ABRAMS, ADLER & NEWMAN

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MINNESOTA

Sparta Foods, Inc.,

                    Plaintiff,

v.

Rupari Food Services, Inc.,

                    Defendant.

Court File No. 99-CV-2041
(MJD/JGL)

**PLAINTIFF'S MEMORANDUM IN
OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS
PLAINTIFF'S COMPLAINT**

## INTRODUCTION

Plaintiff Sparta Foods, Inc. ("Sparta") submits this memorandum in opposition to defendant Rupari Food Services, Inc.'s ("Rupari") motion to dismiss Sparta's Complaint. This case arises out of Rupari's breach of the Supply Agreement ("Agreement") it executed with Sparta, in which Rupari agreed to order 2,000,000 packages of food products, in its initial purchase order to Sparta. Under the terms of the Agreement, a number of the parties' obligations were to occur in Minnesota: Sparta agreed to manufacture Rupari's "Banditos" brand chips and salsa and Rupari's "Banditos" brand chips and cheese products at its facilities in Minnesota; and Rupari agreed that Sparta could sell Rupari's Banditos brand products to certain Minnesota merchants. Consistent with the Agreement, Rupari sent orders for the Banditos brand products to Sparta in Minnesota, and Sparta manufactured and sold Rupari's Banditos brand products in Minnesota.

As is discussed in this memorandum, Rupari's motion should be denied. Contrary to Rupari's contention, Rupari's contacts with Minnesota far exceeded two visits, a few phone calls, and the exchange of some correspondence alleged by Robert Mintz, Rupari's President, in his affidavit. Rather, Rupari's contacts with Minnesota were calculated, substantial, and directly

related to this breach of contract action. Rupari's contacts with Minnesota therefore provide a basis for this court to exercise personal jurisdiction over Rupari.

Rupari's alternative argument -- that this cause of action should be dismissed because it was improperly filed -- is equally deficient. The basis for Rupari's alternative argument is that Sparta allegedly failed to comply with the alternative dispute resolution ("ADR") provision of the Agreement, and that this court therefore does not have jurisdiction over this breach of contract action. Rupari's argument with respect to the ADR provision of the Agreement is neither supported by fact nor law.

## FACTS

### A.    The Parties.

Plaintiff Sparta is a Minnesota corporation engaged in the manufacture and sale of Mexican and other food products under its own trademarks and brand names. Affidavit of Joel Bachul dated February 17, 2000, ¶ 1 (hereinafter "Bachul Affidavit"). Sparta also manufactures chips and other food products for other food companies. Id. Sparta manufactures its products at its production facilities in New Brighton, Minnesota. Id.

Defendant Rupari is a Florida corporation engaged in the sale or distribution of various food products, including Banditos brand chips and salsa, Banditos brand chips and cheese, "Mighty Mouse" children's drinks, and "Mighty Mouse" popcorn. Id., ¶ 3. Rupari also claims to be a national distributor of "Plumrose" meats. Id. ¶ 3.

### B.    Sparta Developed a New Snack Food Concept.

In 1998, Sparta developed a new snack food concept consisting of a single box containing a bag of Sparta's chips and a cup of either cheese or salsa. Id., ¶ 4. In the fall of 1998, Sparta began to market its new product. Id., ¶ 5. In its early efforts to market its new product, Sparta packaged the product under its "La Canasta" label. As part of its marketing

effort, Sparta sent Warren Barclay, its Manager of Product Development, to attend the National Association of Convenience Stores ("NACS") trade show in Atlanta, Georgia. Id., ¶ 6. While at the NACS show, Barclay met Lee Langer of Rupari, who was present at the NACS show to market Rupari's Mighty Mouse products. During the NACS show, Langer expressed an interest in Sparta's new product.

### C.    Rupari Aggressively Pursued a Business Relationship with Sparta.

Shortly after Langer's and Barclay's meeting in Atlanta, Rupari began to aggressively pursue a business relationship with Sparta. Id. In fact, Langer began to call Sparta's offices in Minnesota on a daily basis, often calling Sparta five to ten times in a single day, and sometimes calling Sparta up to twenty times a day. Id., ¶ 6. During these telephone conversations, Langer stated that if Sparta and Rupari worked as a team on Sparta's new product, together they could sell an enormous amount of the new product nationally. Id., ¶ 7.

In an effort to solidify a relationship, Rupari invited representatives of Sparta to visit Rupari's offices in Florida on a number of occasions. Id. Sparta accepted the invitation and had representatives visit Florida in December of 1998. Id., ¶ 8. During that visit, Sparta provided Langer and Robert Mintz with samples of Sparta's new products. Id.

### D.    The Creation of Rupari's Banditos Brand.

Shortly after the meeting in Florida in December of 1998, Rupari suggested a new relationship between Sparta and Rupari. Rather than have Rupari help Sparta with the marketing and distribution of Sparta's new product, as the parties had originally discussed, Rupari suggested that it should take the lead on the product, and that Sparta would serve as Rupari's manufacturer. Id., ¶ 10. To that end, Rupari developed the Banditos trademark and brand for the

new product. Id., ¶ 11. In connection with the Banditos brand, Rupari also created labels and packaging. Id., Exh. A.

In December 1998 and January 1999, Rupari continued to call Sparta daily in Minnesota. Id. The topics of the conversations varied, but related to the same theme: Rupari indicated that it had the ability to take the new product national; that the product should be packaged and marketed under Rupari's Banditos brand; that Rupari could market the Banditos brand along with its "Mighty Mouse" brand; and that Sparta should do everything in its power to make sure it had the capacity to manufacture vast amounts of the new product that Rupari was going to purchase. Id., ¶ 12.

### E.    The Parties Reached the General Terms of the Agreement.

In January 1999, Rupari invited Joel Bachul, Sparta's CEO, and Craig Cram, Sparta's Executive Vice President, to visit its Florida facilities. While in Florida, Sparta and Rupari reached the general terms of the Agreement. Id., ¶ 12. The parties agreed that Sparta would supply the product, Rupari would provide the trademark and packaging for the new product, and that Rupari would place an initial purchase order for at least 2,000,000 packages of the product. Id.

### F.    Sparta Prepared to Produce Large Amounts of Rupari's Banditos Products.

As a result of the agreement reached by Bachul and Mintz, Sparta began to take the steps necessary to produce the amount of product that Rupari had agreed to purchase. Id., ¶ 13. For example, Sparta purchased or leased additional machinery and otherwise made capital investments in preparation for the production of the Banditos product. Id. Sparta would not have made those capital investments if Rupari had not agreed to purchase a specified minimum amount of the Banditos products. Id.

**G.    Rupari Approved the Product and Robert Mintz Traveled to Minnesota to Tout the Banditos Campaign.**

After the January 1999 meeting, Rupari continued to call Sparta in Minnesota on a daily basis to discuss the products and the companies' relationship.  Id.  During this time, Rupari approved the specifics regarding the product, including the packaging and the cheese formulation.  Id.  In February 1999, Mintz traveled to Minnesota for the Sparta shareholders' meeting, at which time they launched the Banditos campaign.  Id., ¶ 15.  Mintz participated in the Banditos product launch.  Id.  In February 1999, Sparta completed the first production runs of the Banditos product.  Id., ¶ 16.

**H.    Rupari and Sparta Executed the Written Supply Agreement.**

During the spring of 1999, Sparta and Rupari negotiated the Agreement.  Id., ¶ 17.  Both parties were assisted by counsel in the negotiations, and they exchanged numerous drafts of the Agreement.  Id.  The final version of the Agreement was executed in May of 1999; it has an effective date of January 14, 1999.  Id., Exh. B.

Under the Agreement, Sparta agreed to manufacture the products in accordance with written specifications.  Id., Exh. B, ¶ 1.1.  Under the Agreement, Rupari would have the right to approve the final packaging design, and the parties agreed that the product would carry a trademark designated by Rupari.  Id., Exh. B, ¶ 2.1.  In addition, Rupari agreed that its initial purchase order would be for at least 2,000,000 packages (166,667 cases) of product.  Id., Exh. B, ¶ 4.2.

In the event that, prior to the effective date of termination or expiration of the Agreement, fewer than 781,000 cases of product had been sold, Rupari agreed to pay Sparta $2.40 times the amount of the shortfall (781,000 less cases purchased by Rupari or sold by Sparta).  Id., Exh. B, ¶ 11.2.ii.  The parties also agreed that Sparta would be permitted to sell Rupari's Banditos

products to specified customers and that the Agreement would be governed by Minnesota law. Id., Exh. B, ¶¶ 3, 12.7.

### I.    The Parties' Efforts to Sell the Product.

Both before and after the execution of the Agreement, Rupari attempted its efforts to market and sell the Banditos products. As part of that effort, Rupari sent written requests for samples to Sparta in Minnesota. Id., Exh. C. Rupari also continued to telephone Sparta on a daily basis. Id., ¶ 23. As Rupari began to sell Banditos products, it sent written purchase orders to Sparta in Minnesota, and mail orders for the product over the telephone. Id., ¶ 20, Exh. D. All told, Rupari ordered approximately $200,000 worth of Banditos from Sparta. Affidavit of A. Merrill Ayers, at ¶ 3 (hereinafter "Ayers Aff.").

At the same time, Sparta sold the Banditos products to the customers referenced on its list. Id., ¶ 2, Exh. A. Sparta made sales to Minnesota distributors or merchants. Id. The products sold by Sparta were shipped to the Minnesota vendors in Banditos packaging. Bachul Aff., ¶ 22. The packaging is labeled with Rupari's Banditos brand, and does not mention Sparta. Id., Exh. A.

### J.    Rupari Breached its Obligations Under the Agreement.

During the summer of 1999, Rupari continued to call Sparta on a daily basis, often indicating that some major order was just around the corner. Id., ¶ 23. In spite of Rupari's representations regarding the major order, the major order never materialized. Id. To make matters worse, Rupari became delinquent on the amounts it owed Sparta. Id., ¶ 24. Sparta initially attempted to address those problems on an informal basis. Id., ¶ 25. After those efforts proved unsuccessful, Joel Bachul informed Rupari by letter dated October 11, 1999, of Rupari's obligations under the Agreement. Id., ¶ 25. Shortly after Rupari received the October 11, 1999,

letter, the parties agreed that Robert Mintz and other representatives of Rupari would travel to Minnesota on October 20 and 21, 1999, to address the issues. Id., ¶ 26.

Robert Mintz, Pete Chiapetta and Ron Cappadosia of Rupari traveled to Minnesota on October 20 and 21, 1999 to meet with Sparta representatives. Id. During the meeting in Minnesota, Rupari and Sparta discussed a number of issues. One issue the parties discussed centered on $50,000 that Rupari owed Sparta for display cases that Rupari had originally agreed to pay for in advance. Id., ¶ 27. Because Rupari failed to pay for the cases, Sparta was forced to incur the cost. Id. On a number of occasions prior to the October 1999 meeting, Rupari had promised to make the $50,000 payment. Id. One time, Rupari went so far as to fax Sparta a copy of the $50,000 check that Rupari claimed was in the mail. Id. Nonetheless, the check never arrived. During the meeting in October, Robert Mintz again agreed to pay Sparta the $50,000. Id. In spite of its promise to pay Sparta $50,000, Rupari never made the payment. Id.

**K.    Sparta Provided Formal Notice to Rupari of Rupari's Breaches of the Agreement.**

On November 18, 1999, Sparta formally provided notice to Rupari of Rupari's breaches of the Agreement. Affidavit of David Meyer, Exh. A (hereinafter "Meyer Aff."). Sparta specifically indicated that Rupari had breached the Agreement by failing to make the minimum order required by the Agreement, and by becoming delinquent on amounts the amounts it owed to Sparta. Id. Sparta further informed Rupari that if Rupari disputed any of Sparta's allegations, that the parties should participate in ADR pursuant to the terms of the Agreement. Id.

Shortly after the November 18, 1999 letter, David Meyer, counsel for Sparta, and Sheldon Burnett, counsel for Rupari, spoke on the telephone in order to schedule a date for the ADR. Id., ¶ 9. Meyer and Burnett agreed to have telephone conference on December 22, 1999. Id. On December 20, 1999, Sheldon Burnett telephoned Meyer and requested that the telephone

conference be rescheduled to January 6, 2000. Id. Meyer agreed to continue the telephone conference, but explicitly stated that by agreeing to continue the conference, Sparta was not waiving any time limits that may have been applicable, and that Sparta would otherwise take the steps necessary to enforce its rights under the Agreement. Id. Meyer confirmed this in a letter to Mr. Burnett dated December 21, 1999. Id., Exh. B. Sparta also terminated the Agreement on December 21, 1999. Id., Exh. C.

On December 22, 1999, Sparta filed this suit. On December 27, 1999 Sparta personally served the suit on Rupari. On January 6, 2000, the parties held a telephone conference. Id. During the January 6, 2000, meeting, Burnett indicated that Rupari would not pay Sparta a dime to resolve this suit. Id. On January 12, 2000, Rupari served the Summons and Complaint for the Florida state court action on Sparta.

### L.    Rupari's Additional Contacts with Minnesota.

In addition to its contacts with Minnesota that relate to its Banditos brand, Rupari has also had and has additional contacts in Minnesota. For instance, Rupari made efforts to market its Mighty Mouse products in Minnesota. Bachul Aff., ¶ 29. To that end, Rupari sought the assistance of Sparta with its efforts to market the Mighty Mouse products to Minnesota customers and Sparta did assist Rupari with those efforts. Id.. Further, during its various contacts with Sparta, Rupari represented that its principal business was in the distribution of Plumrose meats, a Danish product. Id., ¶ 3. Rupari indicated to Sparta that it had large annual sales, and that it had distributed Plumrose products throughout the nation, including Minnesota. Id.

## ARGUMENT

I.    **SPARTA HAS PRESENTED EVIDENCE TO ESTABLISH PERSONAL JURISDICTION OVER RUPARI.**

Although Sparta bears the ultimate burden of proving personal jurisdiction at trial, it need only make a prima facie showing of personal jurisdiction over Rupari to defeat its challenge to personal jurisdiction.   Northrup King Co. v. Compania Productora Semillas Algodoneras Selectes, S.A., 51 F.3d 1383, 1387 (8th Cir. 1995).   In a challenge to jurisdiction at a pretrial stage, the court must view the evidence in the light most favorable and resolve all factual conflicts in Sparta's favor.   Dakota Industries, Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387 (8th Cir. 1991).

As discussed below, Sparta has presented ample evidence for this court to exercise jurisdiction over Rupari.   Not only does Minnesota require only "minimum contacts" with the state for the court to exercise jurisdiction, the evidence Sparta presents establishes that Rupari's contacts with Minnesota were calculated, deliberate, numerous, and related to this cause of action.

A.    **Personal Jurisdiction is Proper in Minnesota if Sparta Establishes that Rupari Had Minimum Contacts with the State.**

The Eighth Circuit applies two related rules to determine personal jurisdiction issues. First, the court considers whether the facts satisfy the forum state's long-arm statute.   Digi-Tel Holdings v. Pro-Teq Telecommunications, (PTE), Ltd. 89 F.3d 519, 522 (8th Cir. 1996). Second, the court considers whether the exercise of personal jurisdiction is consistent with due process.   Id. (citing Northrup King Co., 51 F.3d at 1387).   Because Minnesota's long-arm statute extends the state's jurisdiction to the fullest extent permissible, the court's inquiry focuses on whether an assertion of personal jurisdiction over the defendant would be consistent with the

constitutional guarantees of due process. <u>Soo Line R. Co. v. Hawker Siddeley Canada, Inc.</u>, 950

F.2d 526, 528 (8th Cir. 1991).

Due process requires that a defendant have "minimum contacts" with the forum state

sufficient that maintenance of a suit against that defendant does not offend "traditional notions of

fair play and substantial justice." <u>International Shoe Co. v. Washington</u>, 326 U.S. 310, 316, 666

S. Ct. 154, 158, 90 L. Ed. 95 (1945). The non-resident defendant's conduct in connection with

the forum state must be such that the defendant "should reasonably anticipate being hailed into

court there." <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 297, 100 S. Ct. 580, 62

L. Ed. 2d 490 (1980). All that is necessary is that "there be some action by which the defendant

purposefully avails itself of the privilege of conducting activities within the forum state, thus

invoking the benefits and protection of its laws." <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S.

462, 475, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985) (quoting <u>Hanson v. Denckla</u>, 357 U.S. 235,

253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958)). In other words, the court should consider whether

the defendant's conduct, and its connection to the forum state, are such that the defendant should

reasonably have anticipated being hailed into the courts of that state. <u>Id.</u> at 474, 105 S. Ct. 2174.

The purposeful availment requirement guarantees that the defendant will not be brought into a

jurisdiction solely as the result of random, fortuitous, or attenuated contacts. <u>Id.</u> at 475, 105 S.

Ct. 2174.

The Eighth Circuit examines five factors to determine whether the exercise of personal

jurisdiction comports with due process:

1.    The nature and quality of contacts with the forum state;

2.    The quantity of such contact;

3.    The relation of the cause of action to the contact;

4.    The interest of the forum state in providing a forum for its residents; and

5.    The convenience of the parties.

Aero Systems Engineering, Inc. v. Opron, Inc., 21 F. Supp. 2d 990, 996 (D. Minn. 1998). The

first three factors are the primary factors and should be considered together. Digi-Tel Holdings,

Inc., 89 F.3d at 523. The fourth and fifth factors are secondary.

The third factor -- the relation of the cause of action to the contact -- distinguishes

between specific and general jurisdiction. Digi-Tel Holdings, 89 F.3d at 523, n.4.    General

jurisdiction may be obtained if a defendant's contacts with the forum state are of an amount and

degree sufficient to be found "systematic and continuous."    Helicopteros Nacionales de

Colombia, S.A. v. Hall, 466 U.S. 408, 414, 104 S. Ct. 1868, L. Ed. 2d 404 (1984).    The

Minnesota Supreme Court has interpreted this standard to mean that "the foreign defendant's

activities with respect to the forum state must be of such substance that it would not be unfair for

defendant to be brought into the forum state's court for a cause of action unrelated to those

activities." Real Properties, Inc. v. Mission Ins. Co., 427 N.W.2d 665, 669 (Minn. 1988).

Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a

defendant's actions within the forum state. Digi-Tel Holdings, 89 F.3d at 523, n.4.

This case arises out of the Supply Agreement executed by Sparta and Rupari.  As will be

shown below, Rupari had substantial contacts with Minnesota that arose out of the Agreement.

Therefore, specific jurisdiction should be appropriate. [1]

---

[1]  If this court should find that the contacts are not sufficient for specific jurisdiction, however,
general jurisdiction may still be appropriate.  Although Rupari now contends that it has had no
contact with Minnesota other than those contacts related to its relationship with Sparta, Rupari
previously represented to Sparta that it is a national distributor of Plumrose meats, and that it has
distributed those products into Minnesota for years.  At the very least, if this Court finds that
there is no specific jurisdiction, it should permit Sparta to conduct discovery with respect to
Rupari's general contacts with Minnesota.

**B.    Rupari's Contacts with Minnesota were Calculated, Deliberate, Numerous, and Related to this Cause of Action.**

The nature, quality, and quantity of Rupari's contacts with Minnesota justify this court's exercise of personal jurisdiction over Rupari.  Contrary to its contention, the record establishes that Rupari's contacts with Minnesota far exceeded two visits, a few letters, and some purchase orders.  In fact, Rupari's contacts with Minnesota were numerous, significant, and directly related to this cause of action.

As an initial matter, Rupari cannot dispute that it actively and vigorously pursued a business relationship with Sparta, a Minnesota business.  In fact, in connection with its solicitation of the relationship with Sparta, Rupari made scores of calls to Minnesota weekly over an eight-month period.  The nature and number of telephone contacts may a be significant factor in a personal jurisdiction minimum contacts analysis.  See Beltz v. Schwartz, 1999 WL 1058950 (Minn. Ct. App. 1999)(personal jurisdiction appropriate where out of state defendant engaged in at least 175 phone calls with Minnesota broker, and where out of state defendant sold 50,000 shares of stock to Minnesota investors). [2]

Rupari's contacts with Minnesota were not limited to several hundred telephone calls. Rupari's efforts to cultivate the relationship with Sparta resulted in the execution of the Agreement that provides the basis for this breach of contract lawsuit.  The Agreement itself, and circumstances relating to the Agreement, caused Rupari to have numerous additional contacts with Minnesota, including:

- Rupari's representatives traveled to Minnesota on two occasions to discuss the parties' relationship;

- Drafts of the Agreement were sent to and from Minnesota;

---

[2] Pursuant to Minn. Stat. § 480A.08(3) a copy of Beltz v. Schwartz is attached to this memorandum as Exhibit A.

- The Agreement was executed in Minnesota;

- At Rupari's request, Sparta manufactured hundreds of thousands of Rupari's Banditos brand products in Minnesota;

- Rupari sent numerous requests for samples of its Banditos brand products to Sparta in Minnesota;

- Rupari sent purchase orders for its Banditos brand products to Sparta in Minnesota;

- Rupari sent correspondence to Sparta in Minnesota regarding the Agreement;

- Rupari granted Sparta the right to sell Rupari's Banditos brand products to customers in Minnesota;

- Sparta sold thousands of Rupari's Banditos brand products to customers in Minnesota; and

- The Agreement contains a Minnesota choice of law provision.

Under the circumstances, there can be no question that Rupari purposefully availed itself to the protection of Minnesota's laws, and that jurisdiction over Rupari is proper. Rupari's contacts with Minnesota were neither random, fortuitous, nor attenuated. Rather, they were calculated, deliberate, numerous, and related to the Agreement that provides the basis for this cause of action. Under the circumstances, there certainly is nothing unfair about requiring Rupari to litigate the Agreement in Minnesota.

Case law supports exercising jurisdiction over Rupari. For instance, Rupari's contacts with Minnesota far exceed those of the defendant in Aero Systems Engineering, Inc. v. Opron, Inc., 21 F. Supp. 2d 990 (D. Minn. 1998). In Aero Systems, the plaintiff was a Minnesota corporation headquartered in St. Paul that performed consulting, design, and engineering services in connection with the construction of jet engine test facilities. Id. at 994. The plaintiff entered into a contract with an out-of-state defendant, Orpron, which was based in Boucherville, Quebec. Id. In that contract, the plaintiff agreed to furnish design and engineering services that would

emanate from St. Paul, and which would be used to construct a jet engine testing facility in Quebec. Id. Orpron did not maintain an office, own property, employ agents or authorities Minnesota, and it did not otherwise conduct business in Minnesota. Id. Orpron coordinated the project from Quebec, and only occasionally sent representatives to St. Paul to review the plaintiff's work. Id. After a dispute between the parties developed, the plaintiff sued Orpron in United States District Court for the District of Minnesota.

The Minnesota Federal District Court exercised personal jurisdiction over the defendant, and based its decision on several factors. First, the court relied on the fact that contractual arrangement between the parties that gave rise to the cause of action was negotiated in both St. Paul and in Quebec. Id. at 996. Second, the contract was signed in Minnesota. Id. Third, the majority of the labor that was to take place pursuant to the contract took place in Minnesota. Id. Fourth, the defendant occasionally visited St. Paul to coordinate the various works in the project. Id. Last, the defendant sent many letters and facsimiles to Minnesota. Id. at 997. On those facts, the court concluded that the plaintiff had made a prima facia showing of sufficient contacts between the defendant and Minnesota to justify the exercise of personal jurisdiction over the defendant. Id. As is described above, Rupari's contacts with Minnesota that relate to this cause of action far exceed those of the defendant in Aero Systems.

Moreover, there is another fact which justifies the exercises of personal jurisdiction all by itself: Rupari agreed to permit Sparta to sell Rupari's Banditos products to certain customers in Minnesota, and Sparta did sell Rupari's Banditos products to customers in Minnesota. In Southern Machine Company v. Mohasco Industries, Inc., 401 F.2d 374 (6th Cir 1968), an in state licensee brought a declaratory judgment action relating to its license agreement with an out-of-state defendant. The license agreement at issue called for the manufacture and sale of certain

machines in Tennessee as well as other states, and the facts indicated that the machines were in fact sold in Tennessee. Under the circumstances the Sixth Circuit held:

> The license agreement's direct impact on the commerce of Tennessee can hardly be denied, and it can also hardly be denied that the parties contemplated such an impact at the time the license agreement was executed.
>
> So it is clear that [the out of state defendant] has purposefully availed itself of the privilege of transaction business in Tennessee....

Id. at 383; see also Genetic Implant Systems, Inc. v. Core-Vent Corporation, 123 F.2d 1455 (Fed Cir. 1997)(personal jurisdiction proper where out of state defendant contracted with plaintiff to sell out of state defendant's products into forum state).

Simply stated, Rupari systematically cultivated its relationship with Sparta; that relationship culminated with the final execution of the Agreement in Minnesota; the Agreement contemplated the manufacture and sale of Rupari's product in Minnesota; and this lawsuit arises out of Rupari's breach of the Agreement. These facts are more than enough for the court to conclude that Rupari has "availed itself" of the privilege of conducting business in Minnesota, and that it is proper to litigate the Agreement in Minnesota.

### C.    Minnesota has an Interest in Resolving this Dispute, and the Forum is Convenient.

The fourth and fifth factors also support a finding of personal jurisdiction. Minnesota has an interest in providing a forum for its corporations to enforce contracts regarding the manufacture, sale, and distribution of products in Minnesota and elsewhere. Further, the Agreement is governed by Minnesota law. Further, the fifth factor -- the convenience of the parties -- also support the exercise of jurisdiction. Minnesota is an obviously convenient forum for Sparta. And, although Rupari is located in Florida, it has represented that it is a national food

distributor. Rupari's alleged national presence mitigates any inconvenience it may suffer as a result of being located in Florida.

**D.    The Cases Cited by Rupari to Support its Motion are Easily Distinguishable from the Present Case.**

Rupari cites a string of cases in an effort to bolster its position but it does not address the contacts that Rupari has had in Minnesota in context. Rupari first minimizes its contacts, and then addresses each separate contact in a vacuum, citing a case to support its position with respect to each narrow aspect of the case. Simply stated, the cases cited by Rupari are factually distinguishable from the present case.

For example, Rupari cites <u>Sybaritic, Inc. v. Interport International, Inc.</u>, 957 F.2d 522 (8th Cir. 1992) for the proposition that a two-day visit, even when coupled with further communications, is too attenuated a contact to support jurisdiction. What Rupari fails to state is that in <u>Sybaritic</u>, there were no other contacts with Minnesota other than the two-day visit and some additional communication. In this case, Rupari's contacts were far more extensive, and includes calls, correspondence, purchase orders, and substantive work to be performed in Minnesota, and the sale of products to Minnesota customers.

Similarly, Rupari cites <u>Aylward v. Fleet Bank</u>, 122 F.3d 616 (8th Cir. 1997) for the proposition that contacts, though related to the action in the complaint, may be too tangential to confer jurisdiction. The facts of <u>Aylward</u> must also be placed in context. In <u>Aylward</u>, the defendant's sole contacts with the forum state consisted of three telephone calls and one letter directed to Missouri over a seven-month period. That is in stark contrast to the hundreds of telephone calls, and other activities that were conducted in Minnesota in this case. Again, the facts of <u>Aylward</u> are far different than those of the present case. Rupari has not cited a single

case with facts even remotely close to the present case in which the court determined that it did not have jurisdiction over the out-of-state defendant.

## II.    BECAUSE SPARTA MADE GOOD FAITH EFFORTS TO RESOLVE THIS DISPUTE, THIS LAWSUIT SHOULD NOT BE DISMISSED FOR THE ALLEGED FAILURE TO COMPLY WITH ANY ADR PROVISION.

Without citing any law to support its position, Rupari also argues that Sparta's complaint should be dismissed because Sparta breached the Agreement's ADR provisions. That argument is without either legal or factual support.

The facts of this dispute must be placed in context. Pursuant to the terms of the Agreement, Rupari was obligated to purchase 2,000,000 packages of product. In the fall of 1999, it became apparent that Rupari was not going to order the amount of the product that it was obligated to purchase. To make matters worse, Rupari was not paying the amounts that it owned Sparta. Sparta initially tried to resolve the matter informally. Eventually, the parties held a meeting in Minneapolis on October 21, 1999. During that meeting, Rupari agreed to pay Sparta $50,000 that it had previously agreed to pay Sparta. Rupari also promised that a major order would be forthcoming. By November 10, 1999, neither the payment nor the order had arrived.

On November 18, 1999, Sparta provided Rupari with written notice of Rupari's breaches of the Agreement. Pursuant to the Agreement, Rupari had 30 days to cure the breaches described in Sparta's notice. In the November 18, 1999 notice, Sparta also requested that the parties participate in ADR. The ADR provision of the Agreement provides that in the event of a dispute, a party seeking to initiate ADR shall give written notice of the dispute to the other party. Bachul Aff., Exh. B, ¶ 13.2.i. The Agreement requires the parties to meet promptly, but in no event later than 30 days from the date of the notice. Id., Exh. B., ¶ 13.2.ii. The Agreement further provides that if the dispute is not resolved within 30 days of the initial meeting, either

party may request that the ADR be ended, and the parties may then pursue all available remedies. Id.

Shortly after Sparta provided Rupari with the notice, Sheldon Burnett, then counsel for Rupari, telephoned David Meyer, counsel for Sparta. Meyer and Burnett agreed that the parties would meet through a telephone conference on December 22, 1999. On December 20, 1999, Burnett and Meyer again spoke on the telephone. Burnett indicated that he could not participate in the telephone conference that was scheduled for December 22, 1999, and requested that the telephone conference be continued to January 6, 2000. Meyer agreed to postpone the telephone conference, but clearly indicated that by agreeing to postpone the conference, Sparta was not waiving any applicable time limits, and that Sparta would take the steps necessary to protect its rights under the Agreement. Meyer confirmed this in a letter to Burnett dated December 21, 1999.

On December 21, 1999, because Rupari had not cured the breaches noted in the November 18, 1999 letter, Sparta terminated the Agreement. Sparta filed this suit on December 22, 1999. On December 27, 1999, Sparta served the suit on Rupari. Notwithstanding the commencement of the lawsuit, on January 6, 1999, the parties participated in the telephone conference. In that conference, Rupari refused to pay Sparta anything. On January 10, 2000, Rupari filed its suit against Sparta in Florida state court.

In its memorandum, Rupari claims that Sparta failed to abide by terms of the ADR provision of the Agreement. The opposite is true. Under the terms of the Agreement, Rupari and Sparta were required to meet within 30 days of November 18, 1999. Rupari did not make itself available to do so. Although Sparta agreed to continue the date of the conference, it informed Rupari that by agreeing to the continuance that it was not extending the applicable time

periods. Thus, the ADR provision ended when Rupari failed to meet with Sparta within the 30 period, and Sparta was free to pursue it rights.

Rupari appears to argue that the initial conference occurred on January 6, 2000. If that is the case, then both parties, under the terms of the ADR provision should have been prevented from pursuing their legal remedies until 30 days after January 6, 2000. See Bachul Aff., Exh. B, ¶ 13.2.ii. In spite of this requirement, Rupari filed its suit on January 10, 2000, well before the period noted by the Agreement. Rupari's action in filing lawsuit shortly after the January 6, 2000, telephone conference belies its current argument.

Furthermore, Sparta's efforts to settle this suit failed because Rupari refused to pay "one dime" to resolve this suit. Any further effort to require the parties to attempt to resolve this dispute through ADR, at this point, would be futile. The parties – or at least Sparta – had attempted to resolve this dispute on a number of occasions before commencing litigation, and the efforts had been unsuccessful. It certainly would make no sense to force the parties to jump through a perfunctory hoop before arriving back at this same spot. Though ADR may be a helpful tool to assist the parties to resolve this suit at some point, this court should not dismiss this suit to compel non-binding ADR that has already failed.

## CONCLUSION

For the foregoing reasons, the court should deny Defendant's motion in its entirety.

Respectfully submitted,

Dated:  February 18, 2000.

**FREDRIKSON & BYRON, P.A.**

David D. Meyer (#72436)
John E. Drawz (#24326)
Steven J. Quam (#250673)
1100 International Centre
900 Second Avenue South
Minneapolis, MN 55402-3397
(612) 347-7056/7074/7183
(612) 347-7077 (fax)

**Attorneys for Plaintiff**

Not Reported in N.W.2d
Blue Sky L. Rep. P 74,197
(Cite as: 1999 WL 1058950 (Minn.App.))

Page 1

NOTICE: THIS OPINION IS DESIGNATED AS
UNPUBLISHED AND MAY NOT BE CITED
EXCEPT
AS PROVIDED BY MINN. ST. SEC. 480A.08(3).

**James A. BELTZ, et al., Respondents,**
**v.**
**Samuel D. SCHWARTZ, et al, Defendants and**
**third-party plaintiffs,**
**David Bodner, et al., Appellants,**
**Mark Savage, Third-Party Defendant.**

No. C6-99-713.

Court of Appeals of Minnesota.

Nov. 23, 1999.

Hennepin County District Court, File No.
MC-98-6974, Hon. Robert H. Lynn.

Terrence J. Fleming, Randy G. Gullickson,
Lindquist & Vennum, P.L.L.P., Minneapolis, MN,
for appellants.

Vincent D. Louwagie, Nathan P. Brenna, Fruth &
Anthony, P.A., Minneapolis, MN, for respondents.

Considered and decided by HARTEN, Presiding
Judge, AMUNDSON, Judge, and HOLTAN, Judge.
[FN*]

FN* Retired judge of the district court, serving as
judge of the Minnesota Court of Appeals by
appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

HARTEN, Judge.

*1 Appellants, a New York corporation and its
principals, challenge the district court's denial of
their motion to dismiss respondents' claim for lack
of personal jurisdiction. We affirm.

FACTS

Respondents are a group of Minnesota investors
who bought and sold stock in Incomnet, Inc., a
California corporation. They allege that defendant
Samuel Schwartz, president of Incomnet, devised a
scheme to inflate artificially the price of Incomnet
shares; respondents further allege that he was joined
in this scheme by appellants, New York residents
David Bodner and Murray Huberfeld, and Broad
Capital Associates, Inc., a New York corporation of
which they are the principals. Respondents brought
this action against appellants, alleging violation of
the Minnesota Consumer Fraud Act.

Mark Savage, a Minnesota broker who was in
contact with Schwartz and traded Incomnet stock,
testified by deposition regarding his involvement
with appellants. Savage testified that, based on the
record of his outgoing phone calls, he had made 164
calls to appellants and they had initiated "more than
ten and less than fifty " calls to him, that he gave
them his phone number, and that "Murray Huberfeld
gave me his home phone number, because he had
something to talk to me about that was important."

Savage also testified that when he had a large block
of Incomnet stock to sell because one of his clients
had too much on margin, Schwartz told him to get
in touch with appellants as potential buyers.
Appellants then purchased 50,000 shares of
Incomnet stock, in connection with which Savage
testified that the transaction was done through Nate
Newman and his company, Equity Securities,
located in the IDS building in Minneapolis, and that
Savage had "set Nate Newman up with the Broad
Capital people, David and Murray [i.e.,
appellants]." Savage testified that: (1) he had
conversed with appellants about whether they were
buying or selling Incomnet stock "lots of times; "
(2) appellants did not tell him in the summer of 1995
that "they had sold millions of dollars worth of
Incomnet stock in March and April of 1995; " and
(3) if he had known appellants were involved in
sales of Incomnet stock he would not have
recommended that his clients buy Incomnet stock.
He testified further that appellants faxed him an
article on Incomnet, that David Bodner asked him to
go from Minnesota to a trade show in California,
and that he had gone to New York to meet with
Bodner and Huberfeld.

The district court denied appellants' motion to
dismiss the action for lack of personal jurisdiction.
This appeal followed.

DECISION

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works



EXHIBIT A

[An] appeal from an order denying a pretrial motion to dismiss for lack of personal jurisdiction is properly before this court because such orders are constitutionally appealable as of right.

When a *defendant challenges personal jurisdiction* at the pretrial stage, the plaintiff has the burden of proving a prima facie case supporting jurisdiction. Additionally, the plaintiff's allegations and supporting evidence must be taken as true even though a defendant may dispute contacts alleged by the plaintiff.

*2 * * * *

The [long arm] statute extends the jurisdiction of Minnesota courts to the maximum limits consistent with due process. * * * [I]n doubtful cases, doubts should be resolved in favor of retention of jurisdiction.

S.B. Schmidt Paper Co. v. A to Z Paper Co., 452 N.W.2d 485, 487 (Minn.App.1990) (citations and quotation omitted).

Two Minnesota cases address the question of personal jurisdiction in the context of securities fraud. Both Vikse v. Flaby, 316 N.W.2d 276 (Minn.1982), and Kopperud v. Agers, 312 N.W.2d 443 (Minn.1981), address jurisdiction over one Shelley Richey, who allegedly

committed tortious fraud in Minnesota by failing to disclose [to Minnesota investors in Thunderbird, an Arizona corporation] that [Thunderbird's] mortgaged real estate was inadequate security for the notes [given in exchange for loans made by the Minnesota investors to Thunderbird] when he had special knowledge of that fact.

Kopperud, 312 N.W.2d at 445. Richey's activities occurred in Arizona; he had no contact with Minnesota other than that giving rise to the lawsuit. Id. Minnesota was held to have jurisdiction because Richey was a shareholder, director, officer and general counsel of Thunderbird; his activities were directed toward attaining a commercial benefit in Minnesota; he had met with the broker who handled the Minnesotans' investments; he corresponded with Minnesota attorneys regarding treatment of Thunderbird notes and mortgages.

Richey purposefully availed himself of this state to carry out a scheme to defraud investors. Although his direct contacts with this state were limited, he was instrumental in setting in motion the fraudulent scheme and in keeping it going. The cause of action arises directly out of the fraudulent

transactions. Minnesota has an obvious interest in providing a forum since Minnesotans were defrauded. * * * [P]laintiffs have made a prima facie showing of sufficient Minnesota activities to satisfy due process.

Id. at 446-47.

Vikse further addressed

[w]hether the Minnesota long-arm statute and the United States Constitution permit Minnesota courts to exercise personal jurisdiction over a nonresident individual who was a stockholder, officer, director, and attorney for an Arizona corporation, where the corporation and the individual commit fraudulent acts in Arizona that cause damage in Minnesota.

Vikse, 316 N.W.2d at 280. The trial court had found that Richey

deliberately, and with wrongful purpose, set in motion and perpetuated a course of events, the inevitable effect of which was to harm Minnesotans in general and the plaintiffs in particular.

Id. at 281.

Vikse invoked Minn.Stat. § 543.19, subd. 1(d) (1980), extending jurisdiction over a defendant who "commits any act outside Minnesota causing injury or property damage in Minnesota," subject to three exceptions: (1) Minnesota having "no substantial interest in providing a forum; " (2) jurisdiction violating "fairness and substantial justice," or (3) a cause of action in defamation or privacy.

*3 Richey argued that he came within the second exception. The supreme court rejected the argument, labeled the second exception "a codification of the 'minimum contacts' test " of International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and cited the five factors of that test:

(1) The quantity of the contacts with the forum state,

(2) The nature and quality of the contacts,

(3) The source and connection of the cause of action with these contacts,

(4) The interest of the state providing a forum,

(5) The convenience of the parties.

Vikse, 316 N.W.2d at 282. The first three factors are primary. Id. Appellants, like Richey, do not come within the exceptions.

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

As to the first factor, Richey was held to have a sufficient quantity of contacts because he was "directly or indirectly " involved in transactions with Minnesota residents, corresponded with attorneys and others in Minnesota, and had in his possession and control the satisfactions signed by Minnesota residents. Id.; see also Marquette Nat'l Bank v. Norris, 270 N.W.2d 290, 295 (Minn.1978) (finding jurisdiction over a defendant who had never been to Minnesota but who guaranteed a Minnesota loan to a Minnesota resident because "where the cause of action arises directly out of defendant's contact with the state * * * even one single, isolated transaction " can justify exercising personal jurisdiction). Given the extent of their telephone contact with a Minnesota broker and their purchase of 50,000 shares of stock through that broker, appellants had sufficient contacts in Minnesota.

The second factor requires examination of the potential effect of a contract in the state. Vikse, 316 N.W.2d at 283. If "a contract incurs the benefits and protections of the state's laws for the defendant, the assertion of jurisdiction may be proper." Id. at 282. Here, appellants could have availed themselves of Minnesota law in relation to their transactions with a Minnesota broker.

The third factor is also met. The source and connection of respondents' cause of action is based on appellants' contacts with the broker of Incomnet stock in Minnesota.

As to the fourth factor, Minnesota has an interest in providing a forum because Minnesota citizens have allegedly been defrauded.

As to the last factor, while it may not be convenient for appellants to come to Minnesota, it would be more inconvenient for all the respondents to travel elsewhere. Fairness and substantial justice are not violated by Minnesota's exercise of jurisdiction over them.

Appellants rely on S.B. Schmidt and on Walker Management v. FHC Enters., 446 N.W.2d 913 (Minn.App.1989) (both reversing the denial of motions to dismiss for lack of personal jurisdiction brought by out-of-state purchasers of, respectively, goods and services from Minnesotans), review

denied (Minn. Dec. 15, 1989). Both cases hold that telephone contacts are not sufficient for personal jurisdiction. See S.B. Schmidt, 452 N.W.2d at 488; Walker, 446 N.W.2d at 915. Here, however, telephone contact was not the only contact. Appellants purchased 50,000 shares through a Minnesota broker, an act which could itself support jurisdiction. See generally Vikse, 316 N.W.2d at 276; Kopperud, 312 N.W.2d at 443. Moreover, both S.B. Schmidt and Walker are distinguishable.

*4 In S.B. Schmidt, there was no connection between the parties' contract and the state; the allegedly non-conforming goods were shipped not from Minnesota but from Mexico. Schmidt, 452 N.W.2d at 489. Minnesota was therefore an inconvenient forum because questions as to the quality of the goods would require resolution elsewhere. Id.

In Walker, the defendant was found not to have "purposefully avail[ed] itself of Minnesota law " because "each and every significant element in the formation of the agreement between [the parties] (presentation, negotiation, and execution) occurred outside Minnesota " and "all of [the plaintiff's] services [to the defendant] were to be performed in the Chicago area." Walker, 446 N.W.2d at 915. Minnesota was found to have no significant interest in providing a forum for two reasons: first, "all of [the plaintiff's] efforts were directed, not to Minnesota residents, but to residents in and around the Chicago area " and second, "the lawsuit brought by [the defendant] against [the plaintiff] is still pending in Cook County " so that forum was available for the plaintiff to file a counterclaim and litigate. Id. at 916. Here, there is no indication that respondents can pursue their claims against appellants anywhere other than in Minnesota.

Finally, if there were doubt in this case, it "should be resolved in favor of retention of jurisdiction." Schmidt, 452 N.W.2d at 487. We affirm the district court conclusion that Minnesota has jurisdiction over appellants.

Affirmed.

END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Sparta Foods, Inc.,

               Plaintiff,

v.

Rupari Food Services, Inc.,

               Defendant.

Court File No. 99-CV-2041
(MJD/JGL)

**AFFIDAVIT OF JOEL BACHUL**

STATE OF MINNESOTA   )
                        ) ss.
COUNTY OF HENNEPIN  )

Joel Bachul, being first duly sworn, states:

1.     I am the CEO of Sparta Foods, Inc. Sparta is corporation organized under the laws of Minnesota, and has it principal place of business in New Brighton, Minnesota.

2.     Sparta is engaged in the manufacture and sale of Mexican and other food products under its own trademarks and brand names. Sparta also manufactures food products for other food companies. The products are manufactured at Sparta's plant in New Brighton, Minnesota.

3.     I have had contact with representatives from Rupari Food Services, Inc. since December of 1998. During my numerous conversations with representatives of Rupari, the Rupari representatives indicated that Rupari is engaged in the national sale and distribution of various food products. Specifically, Rupari's representatives stated that Rupari was a national distributor for Plumrose hams and other meats, and that Rupari distributed the Plumrose products in Minnesota. Further, Rupari indicated that it marketed and distributed its Mighty Mouse brand of children's drinks and popcorn.

4.    In 1998, Sparta developed a new snack food concept. This concept consisted of a single package that contained a bag of chips and either a cup of cheese or a cup of salsa.

5.    In the fall of 1998, Sparta sent Warren Barclay, its manager of product development, to the NACS tradeshow in Atlanta, Georgia, for the purpose of marketing Sparta's new product.

6.    Shortly after Mr. Barclay attended the NACS tradeshow in Atlanta, Lee Langer of Rupari began to call Sparta on a daily basis. Often, Mr. Langer would call Sparta five to ten times a day. Many times, Mr. Langer would call Sparta up to twenty times a day.

7.    During his conversations with Sparta's representatives, Mr. Langer urged Sparta to enter into a business relationship with Rupari so that Rupari and Sparta could take Sparta's new product national. I believed that Rupari was actively pursuing a relationship with Sparta.

8.    In its efforts to develop the relationship with Sparta, Rupari on several occasions invited representatives of Sparta to travel to Florida to visit Rupari's offices. Representatives from Sparta traveled to Florida to visit Rupari's offices on several occasions. During these visits, Sparta provided Rupari with samples of its new product.

9.    During Sparta's initial dealings with Rupari, Rupari indicated that it could help Sparta market and distribute Sparta's new product. Conceptually, Sparta understood that Sparta would manufacture and own the product, that Sparta would use its own brand to package the product, and that Rupari would provide marketing, distribution, and brokering services.

10.    In the later half of December 1998, Rupari suggested a change to the proposed relationship between Rupari and Sparta. Rather than have Rupari assist with the marketing and distribution of Sparta's new product, Rupari suggested that Rupari would develop a brand and trademark for the new product, and that Sparta would serve as Rupari's supplier.

11.     Eventually, Rupari developed the "Banditos" brand and trademark for the new product.

12.     In January of 1999, Craig Cram, Sparta's Executive Vice President, and I traveled to Florida to meet with Robert Mintz, the president of Rupari, and Lee Langer, another representative of Rupari. While in Florida, Robert Mintz and I reached an agreement regarding the general terms of the relationship between Sparta and Rupari. Specifically, we agreed that Rupari would provide and own the trademark for the new product. We also agreed that Rupari would make an initial purchase order of 2,000,000 units of the product, and that Sparta would have the production capacity to produce 36,000,000 units of the product during the five-year term of the agreement.

13.     As a result of the general agreement that was reached in January of 1999, Sparta took the steps necessary to insure that it had the production capacity to produce the product that that Rupari had agreed to purchase. Sparta leased and otherwise made capital investments to insure that it would have the production capacity to produce the 36,000,000 units during the five-year term of the agreement. If Rupari had not agreed to purchase a certain amount of the Banditos brand product, Sparta would not have made the capital investments noted above.

14.     In January and February of 1999, Rupari and Sparta continued to speak by the telephone. Rupari approved the specifications of the product, including the packaging that would be used for the product, and the specifications for the product. A true and correct copy of the packaging used for Rupari's Banditos brand product is attached hereto as Exhibit A. The packaging approved by Rupari makes no mention of Sparta.

15.    In February 1999, Sparta invited Robert Mintz to Minnesota so that he could attend Sparta's annual shareholder meeting.  Mr. Mintz came to Minnesota and attended the shareholder meeting to help Sparta launch the Banditos campaign.

16.    In February of 1999, Sparta completed the first production runs of Rupari's Banditos product.

17.    During the spring of 1999, Sparta and Rupari negotiated a written Supply Agreement.  Both parties were advised by counsel in the negotiations of the Supply Agreement.

18.    The final version of the Supply Agreement was first signed in Florida and then sent to Minnesota to be completely executed.  A true and correct copy of the final agreement is attached hereto as Exhibit B.

19.    Both before and after the execution of the written Supply Agreement, Rupari began its efforts to market and sell its Banditos product.  To that end, Rupari sent to Sparta in Minnesota numerous written requests for product samples.  True and correct copies of sample requests are attached hereto as Exhibit C.

20.    Rupari also continued to deal with Sparta on a daily basis regarding the relationship.  In connection with its efforts to sell the product, Rupari either called or sent written purchase orders to Sparta in Minnesota.  True and correct copies of several of the written purchase orders are attached hereto as Exhibit D.

21.    Sparta shipped the Rupari's Banditos products in cases that were approved by Rupari.  A true and correct copy of a case is attached hereto as Exhibit E.

22.    During this time, Sparta made efforts to sell the Rupari product to the customers listed in the Supply Agreement.  Some of Sparta's efforts were successful, and Sparta shipped the Banditos product to Minnesota distributors.  The Banditos product shipped to the Minnesota

distributors was shipped in cases similar to that attached hereto as Exhibit E and in packages like the one attached hereto as Exhibit A.

23.     During the summer and fall of 1999, Rupari continued to call Sparta on a daily basis, often indicating that a major order was just around the corner.   In spite of its representations, the major order never materialized.

24.     To make matters worse, Rupari became delinquent on the amounts it owed for the product it had ordered.

25.     Although I initially attempted to resolve these problems on an informal basis, I decided in October of 1999 that Sparta needed to take formal action.   Accordingly, on October 11, 1999, I informed Rupari that it was in breach of its obligations under the Supply Agreement.

26.     After receiving my letter, Robert Mintz telephoned me and we agreed that Mr. Mintz and other representatives of Rupari would travel to Minnesota to address the issues raised in my October 11, 1999, letter.

27.     During our meeting in October 1999, Rupari and Sparta discussed a number of issues.  For example, Sparta and Rupari discussed Rupari's obligation to pay $50,000 for display cases that Rupari had previously agreed to pay for in advance.  Because Rupari did not pay for the display cases in advance, Sparta paid for the cases.  On a number of occasions, Rupari agreed to pay Sparta the $50,000, one time going so far as faxing a copy of the $50,000 check made payable to Sparta that Rupari stated was in the mail.  In spite of Rupari's promises, the check never arrived.  During the October, 1999 meeting, Robert Mintz again agreed to pay Sparta the $50,000 for the display cases..  In spite of the promise made by Mr. Mintz, Sparta never received the $50,000.

28.    Accordingly, in November of 1999, I instructed Sparta's counsel to take the steps necessary to enforce Sparta's rights under the Supply Agreement.

29.    In 1999, Rupari actively sought the assistance of Sparta with Rupari's efforts to market its Mighty Mouse products to merchants or distributors in Minnesota.  In 1999, Sparta did assist Rupari with Rupari's efforts to market Rupari's Mighty Mouse products to Target and other Minnesota distributors.

_____

Joel Bachul

Subscribed and sworn to before me
this _11th_ day of _February_ 2000.

Ann N. Chupita

Notary Public





# EXHIBIT A

**[Rupari's Banditos™ Nacho Cheese cup cover]**

**[Rupari's Banditos™ Salsa cup cover]**

**[Rupari's Banditos™ Chips & Nacho Cheese package]**

**[Rupari's Banditos™ Chips & Salsa package]**

Affidavit of J. Bachul
February 17, 2000

MAI 11

COPY B

## SUPPLY AGREEMENT

EFFECTIVE DATE:  January 14, 1999

PARTIES:  Sparta Foods, Inc.
1565 First Avenue Northwest
New Brighton, MN  55112                                    ("Sparta")

Rupari Food Services, Inc.
1208 West Newport Center Drive, Suite 100
Deerfield Beach, FL  33442                                 ("Rupari")

RECITALS:

A.  Sparta manufactures and sells Mexican and other food products under its own trademarks and brand names and also manufactures food products for other food companies.

B.  Sparta is willing to supply such products for Rupari on the terms and subject to the conditions of this Agreement.

AGREEMENT:

In consideration of the mutual promises set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.  Supply of Products.

1.1.  Specifications.  Sparta agrees to supply the products identified on Exhibit A attached hereto (the "Products") at Sparta's manufacturing facilities pursuant to the terms and conditions of this Agreement.  Sparta agrees to manufacture the Products in accordance with the written specifications provided by Sparta in writing to Rupari  (the "Specifications").  Sparta agrees to provide Rupari with thirty (30) days prior written notice of any proposed changes to the Specifications.  Such proposed changes to the Specifications shall be subject to Rupari's approval, which approval shall not be unreasonably withheld or delayed.  Rupari acknowledges that the recipes for the Products and manufacturing methods used for manufacturing of the Products have been developed by and are owned by Sparta and/or its subcontractor manufacturers.

1.2.  Quality Control.  Sparta agrees to maintain records of production runs of Product manufactured for a period of two (2) years after such manufacture.

**Affidavit of J. Bachul**
**EXHIBIT B**

- 1 -

2.    Packaging and Inventory.

2.1.    Package Design. Sparta shall package the Products using the packaging design furnished by Sparta and the trademark designated by Rupari ("Rupari Trademark"). Rupari shall have the right to approve the final packaging design including the Rupari Trademark, which approval shall not be unreasonably withheld or delayed. Rupari shall be entirely responsible for the development and cost of the packaging design. If Rupari requests any changes to the packaging design or the type of packaging material used for the Products, Sparta shall not be required to ship Products utilizing such new design and/or packaging material until it is actually available to Sparta in quantities necessary to economically package the Product and the parties have agreed upon the adjustment, if any, to the purchase price of the Product due to such requested change in the packaging design and/or packaging material.

2.2.    Packaging Materials. Sparta will order packaging for the Products from its suppliers according to the minimum order requirements of such suppliers. The price of such packaging is included in the purchase price of the Products. Rupari shall pay Sparta Sparta's actual cost for any extra charges or assessments incurred by Sparta for less-than-minimum or other non-standard size packaging orders required by Rupari. Upon termination of this Agreement for whatever reason, Rupari shall pay to Sparta Sparta's actual cost for any Product packaging in Sparta's inventory. In addition, Rupari shall pay Sparta for any Product packaging purchased by Sparta if such packaging becomes obsolete because it is discontinued by Rupari for any reason.

3.    Exclusivity. During the term of this Agreement, Rupari agrees not to manufacture, or permit any person other than Sparta to manufacture for Rupari or any affiliate of Rupari for resale, any Product or any other chip and cheese or chip and salsa combination product. During the term of this Agreement, Sparta shall be permitted to manufacture and sell the Product to the customers (the "Customers") identified on Exhibit B attached hereto, as amended from time to time by mutual written agreement of the parties, at the prices set forth on Exhibit A (the "Customer Price"). For each sale to a Customer, Sparta shall pay Rupari fifty percent (50%) of the excess of the Net Customer Price over the price for the Product as sold to Rupari and set forth on Exhibit A. The "Net Customer Price" shall equal the Customer Price less associated expenses for brokers' commissions, freight, promotional allowances and rebates and less deductions for returned or damaged goods.

4.    Purchase of Products.

4.1.    Forecasts. Upon execution of this Agreement, Rupari shall provide Sparta with a twelve (12) month rolling forecast of the anticipated purchase orders for each of the Products. Rupari agrees to update such rolling forecast on a monthly basis. Such forecasts shall be provided in good faith but shall not be legally binding on either party.

4.2.    Placement of Orders. Rupari shall place its orders for the Products by delivery by mail or by fax of a written purchase order to Sparta or by such other method as approved by Sparta from time to time. The initial purchase order shall be for at least 2,000,000 packages (166,667 cases). Such purchase orders must identify the Product to be manufactured, the quantity and package size thereof, the shipping location and shipping instructions, requested delivery dates and such other information as Sparta may reasonably request from time to time. Rupari may cancel or modify a purchase order submitted to Sparta only with Sparta's prior written consent; provided, however, no consent is needed if such cancellation or modification is delivered to Sparta prior to Sparta's acceptance of such order. Orders will be deemed accepted if Sparta does not given Rupari written notice of rejection of an order within three (3) business days after receipt of the written order. Rupari may not return Product unless it receives prior written consent of Sparta. Return of defective Product, however, shall be governed by the provisions of Section 7.2. Notwithstanding the above, Sparta agrees to use commercially reasonable efforts to supply all Products ordered by Rupari within a commercially reasonable time.

4.3.    Terms of Orders. The terms and conditions in this Agreement shall be the exclusive contract terms between the parties and Rupari's purchase of the Products. Sparta objects to any terms set forth in Rupari's orders for the Products which are different from or additional to the provisions of this Agreement, and no such terms shall be binding upon Sparta unless both parties specifically agree thereto in a separate writing.

5.    Price and Payment.

5.1.    Price. The price for the Products are specified on Exhibit A attached hereto and are FOB Sparta's location. Sparta may change such prices by delivery of thirty (30) days prior written notice to Rupari. Any such price increases shall be based upon actual increase in Sparta's costs associated with the Products, including, without limitation, cost of ingredients, packaging, labor and overhead allocation. Sparta shall provide to Rupari, upon request, reasonable documentation showing its calculations of and supporting information for any such price change. Rupari shall pay any and all taxes, fees, duties or other governmental charges and all shipping and shipping insurance charges relating to the ordered Products.

5.2.    Payment. Rupari shall pay Sparta for any Products ordered directly by Rupari within ten (10) days after the date of invoice. If Rupari fails to make any payment for Product ordered by it when due, and such nonpayment continues for a period of five (5) days after delivery of written notice by Sparta regarding such nonpayment, Sparta shall have the right to require Rupari to pay all purchase orders for the Product in

advance, by COD, by letter of credit or by any other means upon notifying Rupari of the change in credit terms.

5.3.    Late Fees and Collection Costs.  Any amounts not paid by Rupari when due will be subject to a late payment fee computed daily at a rate equal to the lesser of twelve percent (12%) per annum or the highest rate permitted under applicable usury law. In addition, Rupari shall be liable to Sparta for all costs incurred by Sparta in its collection of any amounts owing by Rupari which are not paid when due, including, without limitation, collection agency fees or reasonable attorneys' fees and expenses.

6.    Delivery and Inspection.

6.1.    Delivery.  Sparta will deliver the Products using the carrier designated in the purchase order, or if not so designated, by a carrier selected by Sparta.  Title to and all risk of loss regarding the Products shall pass to Rupari when Sparta delivers the Products to such common carrier for shipment to the location designated in the purchase order.

6.2.    Inspection.  Rupari or its customer, if a Product is shipped directly to the customer, shall inspect all Products promptly upon receipt and either Rupari or the customer shall notify Sparta within seven (7) working days after receipt of any shortages, damages or other non-conformance of the shipped Products which is discoverable upon a visual inspection.  After such time period, Sparta shall not be liable for any non-conformance of the Products which Rupari and/or its customer could reasonably have discovered within such time period, excepting for breach of warranty claims.

7.    Warranties; Indemnification; Insurance.

7.1.    By Rupari.  Rupari represents and warrants that it has full right and title to the Rupari Trademark and the package design and agrees that Sparta shall have no liability to Rupari or to any third party for packaging the Products using the Rupari Trademark and the package design supplied by Rupari.  Rupari agrees to indemnify and hold Sparta harmless from and against any and all claims (including, without limitation, infringement claims), liabilities, damages, costs and expenses (including reasonable attorneys' fees and legal expenses) which Sparta may suffer or incur relating to or arising out of, directly or indirectly, (i) use of the Rupari Trademark and/or the package design supplied by Rupari for the Products, (ii) use or consumption of any of the Products to the extent arising from any negligent or intentional act or omission of Rupari.

7.2.    By Sparta.  Sparta warrants to Rupari that the Products sold under this Agreement shall be manufactured in accordance with the Specifications and shall be merchantable in accordance with FDA standards at the time and point of delivery.  The exclusive remedy for breach of such warranty shall be, at Sparta's option, to either (i)

replace the defective Product or (ii) refund the purchase price of the defective Product paid by Rupari. Rupari shall promptly notify Sparta in writing of any alleged breaches of this warranty. Rupari shall not return to Sparta any alleged defective Product, or take any credits against its Product invoices for such alleged defective product, without the prior written authorization of Sparta. EXCEPT AS EXPRESSLY PROVIDED ABOVE, SPARTA MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, WITH RESPECT TO THE PRODUCTS, WHETHER AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT, WARRANTIES ARISING FROM COURSE OR DEALING OR ANY OTHER MATTER. No employee or representative of Sparta shall have any authority to bind Sparta to any warranty or representation except as expressly stated above. Rupari shall be exclusively responsible for any warranty or representation which Rupari makes to any customer. Notwithstanding the above disclaimers, Sparta agrees to indemnify and hold Rupari harmless from and against any and all third party claims (including, without limitation, infringement claims) and any liabilities, damages, costs and expenses (including reasonable attorneys' fees and legal expenses) resulting therefrom which Rupari may suffer or incur relating to or arising out of, directly or indirectly, (i) use of the Specifications supplied by Sparta for the Products, or (ii) use or consumption of any of the Products to the extent arising from (A) a breach of the above warranty or (B) any other manufacturing defect in the Product or any negligent or intentional act or omissions of Sparta or its employees. Nothing in this paragraph shall be interpreted to limit Sparta's liability as manufacturer of the Products to third party consumers.

      7.3.   Insurance. Sparta shall maintain products liability insurance covering the Products in a minimum amount of Two Million Dollars ($2,000,000). Sparta shall provide Rupari with insurance certificates evidencing such insurance coverage at the request of Rupari. Rupari shall be named as loss payee and additional insured under such policies.

      8.   Independent Contractor Rupari is and shall remain an independent contractor. Neither this Agreement nor the relationship between the parties constitutes a partnership, franchise or joint venture between Sparta and Rupari. Neither party shall have any authority or right under any circumstances whatsoever to bind or purport to bind the other party in any manner or thing whatsoever.

      9.   Confidentiality.

      9.1.   Definition. The term "Confidential Information" as used in this Agreement means any information or compilation of information which is proprietary to one of the parties to this Agreement and relates to such party's existing or reasonably foreseeable business, including, without limitation, trade secrets, the Specifications,

- 5 -

information relating to products of the disclosing party, manufacturing techniques, recipes, data, marketing strategies, product development, customer information and any other information about the disclosing party's business which is normally considered confidential or which is indicated in writing to be confidential or trade secret. Confidential Information shall not include any information:

     i.    which is part of the public domain or becomes part of the public domain through no fault of the receiving party; or

     ii.    which was already in the receiving party's possession, as evidenced by written documentation, prior to the disclosure of such information to the receiving party by the disclosing party; or

     iii.    which is subsequently disclosed to the receiving party on a non-confidential basis by a third party who is not under any obligation of confidentiality relating to such disclosed information; or

     iv.    which is specifically authorized by the disclosing party, in writing, to be disclosed; or

     v.    which is required to be disclosed by applicable law or order of a court of competent jurisdiction in which case the receiving party agrees to notify the disclosing party of such requirement and to cooperate with the disclosing party in an effort to narrow or avoid disclosure.

    9.2.   <u>Nondisclosure</u>. During the term of this Agreement and at all times thereafter, the receiving party agrees to hold in strictest of confidence and to never disclose, transfer, convey, make assessable to any person or use in any way Confidential Information of the disclosing party for its own or another's benefit or permit the same to be used in competition with the disclosing party. Rupari agrees to disclose the Specifications to its employees only on a "need to know" basis. Upon the request of Sparta, Rupari shall require its employees who are given access to the Specifications to execute confidentiality agreements regarding the Specifications. Each party agrees to take reasonable precautions to prevent its employees, representatives, agents and others from disclosing or appropriating for their own use any and all of the Confidential Information of the other party.

    10.   <u>Term and Termination</u>. This Agreement shall begin on the date inserted on the front page hereof and shall continue for five (5) years or unless terminated earlier in any manner provided below:

10.1.   Either party may terminate this Agreement if the other party commits a breach of this Agreement and fails to remedy such breach within thirty (30) days after delivery of written notice from the non-breaching party describing the alleged breach.

10.2.   Either party may terminate this Agreement effective immediately upon delivery of written notice to the other party, if the other party (i) is unable to pay its debts as they mature or admits in writing its inability to pay its debts as they mature, (ii) makes a general assignment for the benefit of creditors, (iii) files a voluntary petition for bankruptcy or has filed against it an involuntary petition for bankruptcy, or (iv) applies for the appointment of a receiver or trustee for substantially all of its assets or permits the assignment of any such receiver or trustee who is not discharged within a period of thirty (30) days after such appointment.

11.     <u>Effect of Termination</u>.

11.1.   <u>Return of Confidential Information</u>.  Upon termination of this Agreement, each party shall, within ten (10) days after the termination of this Agreement (or such earlier time as request by the other party), return to the other party all copies of materials and documents or copies thereof containing any Confidential Information of the other party.

11.2.   <u>Payment Obligations</u>.  Upon termination or expiration of this Agreement:

i.      Rupari shall pay Sparta Sparta's actual cost for any Product packaging in Sparta's inventory as provided in Section 2.2 above.

ii.     If the total of cases of Product purchased by Rupari and sold by Sparta to Customers prior to the effective date of termination or expiration of this Agreement is less than Seven Hundred Eight One Thousand (781,000) cases of Product, Rupari shall pay Sparta Two and 40/100 Dollars ($2.40) times the shortfall (i.e. calculated by taking 781,000 minus (the number of cases purchased by Rupari from Sparta plus the number of cases of Product sold by Sparta to Customers).  Such amount shall be payable by Rupari within ten (10) business days after the effective date of termination or expiration.

iii.    Rupari shall also pay Sparta for all Product ordered by Rupari prior to the effective date of termination or expiration and delivered by Sparta in accordance with the payment terms set forth in Section 5.2.

11.3.   <u>Surviving Obligations</u>.  Any provisions contained in this Agreement which by their terms are intended to continue after termination or expiration of this Agreement

shall survive such termination or expiration, including, without limitation, the provisions of Sections 5, 7, 9, 11, 12 and 13.

12.    General Provisions.

   12.1.    Nonassignment: Binding Nature.  Neither party shall transfer or assign any of its rights or obligations under this Agreement without the other party's prior written consent, except as part of a merger or to a successor who purchases a controlling interest in the stock of the party or purchases substantially all of the assets of the party.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their permitted successors and assigns.  Notwithstanding the above provisions, Sparta shall have the right to sublicense the manufacturing obligations hereunder to a third party with Rupari's consent, which shall not be unreasonably withheld.  Sparta shall continue to be primarily liable for performance under this Agreement.

   12.2.    Force Majeure.  No party to this Agreement will be liable to any other party or be in breach of this Agreement caused in whole or in part by any event beyond such party's reasonable control, including without limitation, acts of God, fire, war, strikes, riots, acts of any government or any agency or subdivision thereof, transportation delays, or shortage or inability to secure labor, fuel, energy, raw materials, supplies or machinery at reasonable prices from regular sources.

   12.3.    Entire Agreement.  This Agreement, together with the Exhibits, contains the entire contract between the parties as to the subject matter hereof and supersedes any prior or contemporaneous written or oral agreements between the parties with respect to the subject matter hereof.

   12.4.    Modifications and Waivers.  No purported amendment, modification or waiver of any provision of this Agreement shall be binding unless set forth in a written document signed by all parties (in the case of amendments and modifications) or by the party to be charged thereby (in the case of waivers).  Any waiver shall be limited to the circumstance or event specifically referenced in the written waiver document and shall not be deemed a waiver of any other term or provision of this Agreement or of the same circumstance or event upon any recurrence thereof.

   12.5.    Notices.  Any notice required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly delivered (i) when received if delivered by hand, (ii) the next business day if placed with a reputable overnight carrier for delivery on the morning of the next business day or (iii) four (4) business days after deposit, if placed in the mail for delivery by registered or certified mail, return receipt requested, postage pre-paid, and addressed to the appropriate party at

- 8 -

the addresses set forth on the first page hereof. All notices to Sparta should be addressed to the attention of the Chief Financial Officer. All notices to Rupari should be addressed to the attention of Robert Mintz. If either party should change its address, such party shall give written notice of the other party of the new address in the manner set forth above, but any such notice shall not be effective until received by the addressee.

12.6.   <u>Severability</u>. In the event that any provision, or portion thereof, is held to be unenforceable by final order of any court of competent jurisdiction, such provision, or portion thereof, shall be severed herefrom without effecting the validity or enforceability of the remaining provisions.

12.7.   <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota, without application of its conflict of laws provisions.

13.   <u>Dispute Resolution</u>.

13.1.   Sparta and Rupari have entered into this Agreement in good faith and in the belief that it is mutually advantageous to them. It is with that same spirit of cooperation that these parties pledge to attempt to resolve any dispute amicably, without the necessity of litigation. Accordingly, the parties agree that if any dispute ("Dispute") arises between them concerning this Agreement, other than an action to enjoin the unauthorized disclosure of confidential or proprietary information, the parties will make a good faith attempt to resolve the Dispute by alternative dispute resolution (ADR) prior to commencing any legal action to interpret or enforce this Agreement. The ADR procedures set forth in this Article 13 apply strictly to disputes arising directly out of each party's obligations set forth in this Agreement.

13.2.   Without limiting the scope or method of ADR to be employed by subsequent mutual agreement, the parties agree and commit to the following efforts at a minimum:

i.      The party seeking to initiate the ADR (the "Initiating Party") shall give written notice to the other party or parties involved in the dispute. The notice must describe in general terms the nature of the Dispute and the Initiating Party's claim for relief and identifying one or more individuals with authority to settle the Dispute on such party's behalf. The party receiving such notice (the "Responding Party") shall have ten (10) days within which to designate one or more individuals with authority to settle the Dispute on such Party's behalf. (The individuals so designated shall be known as the "Authorized Individuals").

ii.    The Authorized Individuals shall meet promptly, but in no event later than thirty (30) days from the date of the Notice of Dispute. If the Dispute has not been resolved within thirty (30) days from the date of their initial meeting, the Initiating Party or Responding Party may request that ADR be ended in which case the parties may then pursue available legal remedies.

iii.    ADR attempts under this Agreement are considered a compromise negotiation for purposes of the Federal and State Rules of Evidence and shall constitute privileged communication. The entire ADR process is confidential and no stenographic, visual or audio record will be made.

13.3.    All conduct, statements, promises offers, views and opinions, whether oral or written, made in the course of the ADR process by any party, by their agents, employees, representatives or other invitees and by the mediator are confidential and shall, in addition and where appropriate, be deemed to be privileged. Such conducts, statements, promises, offers, views and opinions shall not be discoverable or admissible for any purposes including impeachment, in any litigation or other proceeding involving the parties, and shall not be disclosed to anyone not an agent, employee, expert, witness or representative of any of the parties; provided, however, that evidence otherwise discoverable or admissible shall not be excluded from discovery or admission as a result of its use in the mediation.

The parties have executed this Agreement, in the manner appropriate to each, to be effective as of the date on the first page hereof.

SPARTA FOODS, INC.                                RUPARI FOOD SERVICE, INC.

By_____                By_____
Its_____                Its_____

2215457-6
(1bhgh06!.doc

Exhibit A
Products/Prices

For sales of Products to Rupari:

| Item Number | Packs/Case | Description | FOB Price/Case |
|---|---|---|---|
| 00125 | 12 packages/case | Banditos chips/cheese package | $10.08 |
| 00135 | 12 packages/case | Banditos chips/salsa package | $10.08 |

For sales of Products to Customers:

| Item Number | Packs/Case | Description | FOB Price/Case |
|---|---|---|---|
| 00125 | 12 packages/case | Banditos chips/cheese package | $19.08 |
| 00135 | 12 packages/case | Banditos chips/salsa package | $19.08 |

- 11 -

# THE TASTE OF OLE MEXICO



**ROPARE FOODSERVICES, INC**
1208 W. NEWPORT
CENTER DR.
SUITE #200
DEERFIELD BEACH, FL.
33442
(954)-480-9110ph
(954)480-6974fx

~3 Kleek
3/17

*Call me When you Get this Please!*

# Fax

| | |
|---|---|
| **To:** Kathy | **From:** LISA MILLER |
| **Fax:** 651-697-0484 | **Pages:** 36  INCL. COVER |
| **Phone** | **Date:** 3/17/99 |
| **Re:** Sample Requests | **CC:** |

☐ Urgent     X For Review     X Please Comment     X Please Reply     ☐ Please Recycle

**• Comments:** Attached you will find 3433 Sample Request forms.

1) Please Note
1SS should be ISS
12S should be IS6
Sorry!

1. All samples to be sent "Ground"
2. please per Craig inclued something to let people Know chips are New + improved
3. All samples are Numbered please make sure you Ref. this # on all Bills you intend on us to pay! If # is Not on bill It will Not Be paid! (per ROBERT MINTZ)

Thanks

SINCERELY,

LISA MILLER
SALES ASSISTANT

**P.O. # MUST APPEAR
ON INVOICE OR IT
WILL BE RETURNED UNPAID**

SP002044

Affidavit of J. Bachul
EXHIBIT C

**RUPARI FOOD SERVICES, INC.**
**1208 W. NEWPORT CENTER DR. suite#200**
**DEERFIELD BEACH, FL. 33442**
**Phone: 954-480-9110**
**Fax: 954-480-6974**



## RUPARI BEVERAGE DIVISION



*Change to Rupari UPS*

| To: | WARREN BARCLAY | From: | LISA MILLER |
|---|---|---|---|
| Fax: | 1-651-697-0600 | Date: | March 16, 1999 |
| Phone: | | Pages: | 9   incl. Cover |
| Re: | SAMPLE ORDERS | CC: | |

☐ Urgent    X For Review    X Please Comment    X Please Reply    ☐ Please Recycle

## •Comments:

**WARREN, HERE ARE 8 SAMPLE REQUESTS FOR YOU TO SEND OUT. PLEASE NOTE THAT THEY ARE NUMBERED. PLEASE MAKE SURE ANY BILLS YOU SEND US REFRENCE THE PO# NUMBER I HAVE PUT ON EACH FORM OR THE BILLS WILL NOT BE PAID FROM THIS DAY FORWARD (PER ROBERT MINTZ).**

**THANK YOU**

**P.S. WE WILL BE RE-SENDING EVERYONE SAMPLES LIKE WE DID THE FIRST RUN BECAUSE OF THE CHIP CHANGE.SO I AM GOING TO HAVE TO SEND YOU ALL NEW REQUEST FORMS THAT ARE NUMBERED.PLEASE WAIT FOR THESE BEFORE YOU RE-SEND ANYTHING!!!!!!!**

**SINCERELY,**

**LISA MILLER**

**SALES ASSISTANT**

JUL 16 99 A or B Salsa

JUL 09 99 G or I Cheese

**SP002045**

TODAYS DATE
| 3/16/99 |

**PLEASE REFRENCE THIS
NUMBER ON INVOICES
| 2000 |

### Sample Request Form

| Broker: | REJ SALES & MARKETING |
| | DICK JOYAL |

**Product to be Shipped:**

| 1Case(s) | 00155 | "BANDITOS" CHIPS-N-SALSA |
| 1Case(s) | 00156 | "BANDITOS" CHIPS-N-NACHO CHEESE |
| | | |
| | | |

| How Shipped: | GROUND |

| Customer: | SHIP TO: |
| : | MARVIN GITTER |
| : | 4948 BOXWOOD CIRCLE |
| : | BOYTON BEACH, FL. 33436 |
| : | |
| : | |
| : | |
| : | |

| Date When Needed: |

**Broker**

SP002046

PROCESSED ON: 3/16/99    BY: LISA MILLER / SALES ASSISTANT

**TODAYS DATE**
3/16/99

**PLEASE REFRENCE THIS
NUMBER ON INVOICES**
2001

### Sample Request Form

**Broker:**   REJ SALES & MARKETING
                DICK JOYAL

**Product to be Shipped:**

| | | |
|---|---|---|
| 10Case(s) | 00155 | "BANDITOS" CHIPS-N-SALSA |
| 10Case(s) | 00156 | "BANDITOS" CHIPS-N-NACHO CHEESE |
| | | |
| | | |

**How Shipped:**   GROUND

**Customer:**      SHIP TO:
                    KAYATTA BURKE
                    980 SAWYER ST
                    So. PORTLAND, ME. 04106

**Date When Needed:**      NEW ENGLAND FOOD SHOW 3/24, 3/25

**Broker**

SP002047

PROCESSED ON: 3/16/99    BY: LISA MILLER / SALES ASSISTANT

TODAYS DATE
3/16/99

**PLEASE REFRENCE THIS
NUMBER ON INVOICES
2002

### Sample Request Form

| Broker: | BERGENFIELD & ASSOC. |
| | ALAN BERGENFIELD |

**Product to be Shipped:**

| 2Case(s) | 00155 | "BANDITOS" CHIPS-N-SALSA |
| 2Case(s) | 00156 | "BANDITOS" CHIPS-N-NACHO CHEESE |
| | | |
| | | |

| How Shipped: | GROUND |

| Customer: | SHIP TO: |
| : | JOE McGLONE |
| : | 11 KENNINGTON RD. |
| : | MARLTON, NJ. 08053 |
| : | |
| : | |
| : | |
| : | |

**Date When Needed:**

Broker

**SP002048**

PROCESSED ON: 3/16/99    BY: LISA MILLER / SALES ASSISTANT

TODAYS DATE
3/16/99

**PLEASE REFRENCE THIS
NUMBER ON INVOICES
2003

## Sample Request Form

**Broker:** SUNFRESH SALES
GEORGE SIMONS

**Product to be Shipped:**

| 4Case(s) | 00155 | "BANDITOS" CHIPS-N-SALSA |
| 4Case(s) | 00156 | "BANDITOS" CHIPS-N-NACHO CHEESE |
| | | |
| | | |

**How Shipped:** GROUND

**Customer:**    SHIP TO:

GEORGE SIMONS
651 GOODWIN DR.
RICHARDSON, TX. 75081

**Date When Needed:**

Broker

**SP002049**

PROCESSED ON: 3/16/99    BY: LISA MILLER / SALES ASSISTANT

TODAYS DATE
3/16/99

**PLEASE REFRENCE THIS
NUMBER ON INVOICES
2004

## Sample Request Form

**Broker:** BERGENFIELD & ASSOC.
ALAN BERGENFIELD

**Product to be Shipped:**

| | | |
|---|---|---|
| 2Case(s) | 00155 | "BANDITOS" CHIPS-N-SALSA |
| 2Case(s) | 00156 | "BANDITOS" CHIPS-N-NACHO CHEESE |
| | | |
| | | |

**How Shipped:** GROUND

**Customer:** SHIP TO:
: BOB KABIK
: 5 SUNDAY CT.
: REISTERSTOWN,MD. 21136
:
:
:
:

**Date When Needed:**

Broker

SP002050

PROCESSED ON: 3/16/99   BY: LISA MILLER / SALES ASSISTANT

TODAYS DATE
3/16/99

**PLEASE REFRENCE THIS
NUMBER ON INVOICES
2005

### Sample Request Form

**Broker:** BERGENFIELD & ASSOC.

ALAN BERGENFIELD

**Product to be Shipped:**

| | | |
|---|---|---|
| 4Case(s) | 00155 | "BANDITOS" CHIPS-N-SALSA |
| 4Case(s) | 00156 | "BANDITOS" CHIPS-N-NACHO CHEESE |
| | | |
| | | |

**How Shipped:** GROUND

**Customer:**    SHIP TO: .
    :    ALAN BERGENFIELD
    :    12000 TRAIL RIDGE DR.
    :    POTOMAC, MD. 20854
    :
    :
    :

**Date When Needed:**

**Broker**

SP002051

PROCESSED ON: 3/16/99    BY: LISA MILLER / SALES ASSISTANT

TODAYS DATE
| 3/16/99 |

| Sample Request Form |

| Broker: | AMPAX PACKAGING |
| | ALAN GORDON |

| Product to be Shipped: | | |
| 6Case(s) | 00155 | "BANDITOS" CHIPS-N-SALSA |
| 6Case(s) | 00156 | "BANDITOS" CHIPS-N-NACHO CHEESE |
| | | |
| | | |

| How Shipped: | GROUND |

| Customer: | SHIP TO: |
| : | ALAN GORDON |
| : | 1666 NEWBRIDGE RD. |
| : | BELLMORE, NY. 11710 |
| : | |
| : | |
| : | |
| : | |

| Date When Needed: |

**Broker**

SP002052

PROCESSED ON: 3/16/99    BY: LISA MILLER / SALES ASSISTANT

TODAYS DATE
3/16/99

**PLEASE REFRENCE THIS
NUMBER ON INVOICES
2007

## Sample Request Form

**Broker:** LEMONIER ENTERPRISES
JOE NOTARO

**Product to be Shipped:**

| 6Case(s) | 00155 | "BANDITOS" CHIPS-N-SALSA |
| 6Case(s) | 00156 | "BANDITOS" CHIPS-N-NACHO CHEESE |
| | | |
| | | |

**How Shipped:** GROUND

**Customer:**  SHIP TO:
:  JOE NOTARO
:  23525 N. 75TH PL.
:  SCOTTSDALE, AZ. 85255
:
:
:
:
:

**Date When Needed:**

Broker

**SP002053**

PROCESSED ON: 3/16/99    BY: LISA MILLER / SALES ASSISTANT



**RUPARI**
**FOODSERVICES, INC.**
**1208 W. NEWPORT CENTER DR.**
**SUITE #200**
**DEERFIELD BEACH, FL. 33442**
**(954)-480-9110ph / (954)480-6974fx**

# Fax

To: Cathy / sparta          From: LISA MILLER

Fax: 651-697-0600     Pages: 1   INCL. COVER

Phone:                Date: 3 10 99

Re:                   CC:

☐ Urgent    X For Review    X Please Comment    X Please Reply    ☐ Please Recycle

● Comments: Please send overnight
2 Cases of each salsa&Chees
To: Joe Notaro
23525 N. 75th PL.
Scottsdale, AZ 85255

SINCERELY

LISA MILLER
SALES ASSISTANT

OUR UPS #
238 91 X

SP002054

RUPARI FOOD SERVICE CO, INC.
GROCERY DIVISION
1208 W. NEWPORT CENTER DRIVE
SUITE 200
DEERFIELD BEACH, FL 33442
PHONE: (954) 480-0659
PHONE: (800) 766-7516
FAX:    (954) 480-6974

# facsimile transmittal

| To: | CRAIG CRAM | Fax: | 651/697-0600 |
|---|---|---|---|
| From: | DON BUZA | Date: | 03/02/99 |
| Re: | BANDITOS | Pages: | 6 |
| CC: | | | |

☐ Urgent    X For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

CRAIG,

THE FOLLOWING ARE THE ADDITIONAL SAMPLE REQUESTS I SPOKE TO YOU

ABOUT LAST NIGHT.  PLEASE SEND ALL SHIPMENTS UPS GROUND RATE

UNLESS OTHERWISE REQUESTED.  RUPARI UPS ACCOUNT NUMBER IS

23891X.

LET ME KNOW IF I CAN BE OF ANY FURTHER ASSISTANCE.

DON BUZA

NATIONAL BRAND MANAGER

SP002055



0029372
ACKNOWLEDGMENT

RUPARI FOOD SERVICES.INC.          RUPARI FOOD SERVICES.INC.
1208 W. NEWPORT CENTER DR          1287 E. NEWPORT CENTER DR
SUITE 100                          UNIT 206
DEERFIELD BEACH FL 33442           DEERFIELD BEACH FL 33442


U500     50    2188-2189   UPS GROUND    09/28/99  Net 10        09/28/99   1

Acknowledgment of order received, not an Invoice


| 2 | 2 00175 | BANDITOS JR 12PK SALSA REQ. SHIP DATE 09/28/99 | 6.75 | 13.50 |
| 2 | 2 00176 | BANDITOS JR 12PK CHEESE REQ. SHIP DATE 09/28/99 | 6.75 | 13.50 |
| 1 | 1 MISCSALES | MISC ACCTS RECEIVABLE REQ. SHIP DATE 09/28/99 ITEM#00185-LUNCH PACK DISPLAY SHIPPER 112 CT | 87.50 | 87.50 |
| 2 | 2 MISCSALES | MISC ACCTS RECEIVABLE REQ. SHIP DATE 09/28/99 CHARGE FOR BOXES USED FOR SHIPPING: 2 @ .36/EA SAMPLES SHIPPED #2188-89 | 0.36 | 0.72 |

115.22

**SP002056**                                0.00

URCE   RUPARI SAM                                          115.22

29372

| TODAYS DATE | | **PLEASE REFRENCE THIS |
|---|---|---|
| 9/27/99 | | NUMBER ON INVOICES |
| | | 2188 |

## Sample Request Form

| Broker: | GEORGE SIMONS |
|---|---|
| | 651 GOODWIN DR. |
| | RICHARDSON, TX. 75081 |
| | 800-786-6046 |

| Product to be Shipped: | | | | COUPON # | where at on Pkg. |
|---|---|---|---|---|---|
| Case(s) | 00154 | "BANDITOS" 6pk. ( 3 cheese & 3 salsa ) | | 3 | ON CASE |
| Case(s) | 00155 | "BANDITOS" 12pk. CHIPS-N-SALSA | | 4 | EACH UNIT |
| Case(s) | 00156 | "BANDITOS" 12pk. CHIPS-N-NACHO CHEESE | | 4 | EACH UNIT |
| 1 Case(s) | 00175 | "BANDITOS" Lunch pk. 12pk. CHIPS-N-SALSA | 75¢ off | 5 | EACH UNIT |
| 1 Case(s) | 00176 | "BANDITOS" Lunch pk. 12pk. CHIPS-N-NACHO CHEESE | 75¢ eec | 5 | EACH UNIT |
| Case(s) | 00195 | "BANDITOS" Lunch pk. VARIETY 12PK. ( 6&6 ) | | 2 | ON CASE |
| Case(s) | 02195 | "BANDITOS" Lunch pk. VARIETY 6PK. (3&3) | | 3 | ON CASE |
| 1 SHIPPER | 00185 | BANDITO Lunch Pk>Display Shipper ( 112 units ) | 75¢ off | 5 | EACH UNIT |

87.50

| How Shipped: | GROUND |
|---|---|

| Customer: | PRESENTING TO: |
|---|---|
| | OKLAHOMA GROCERS SHOW |

| Date When Needed: | NEED BY 10-5-99 |
|---|---|

Done 5-28-99

Broker

SP002057

*PROCESSED ON: 9/27/99    BY: LISA MILLER / SALES ASSISTANT*

29372

**TODAYS DATE**
9/27/99

**\*\*PLEASE REFRENCE THIS NUMBER ON INVOICES**
2189

## Sample Request Form

**Broker:** RUPARI FOODS
LISA MILLER

**Product to be Shipped:**

|  |  |  | COUPON # | where at on Pkg. |
|---|---|---|---|---|
| Case(s) | 00154 | "BANDITOS" 6pk.  ( 3 cheese & 3 salsa ) | 3 | ON CASE |
| Case(s) | 00155 | "BANDITOS" 12pk. CHIPS-N-SALSA | 4 | EACH UNIT |
| Case(s) | 00156 | "BANDITOS" 12pk. CHIPS-N-NACHO CHEESE | 4 | EACH UNIT |
| 1 Case(s) | 00175 | "BANDITOS" Lunch pk. 12pk. CHIPS-N-SALSA | 15 ea 5 | EACH UNIT |
| 1 Case(s) | 00176 | "BANDITOS" Lunch pk. 12pk. CHIPS-N-NACHO CHEESE | 75 ea 5 | EACH UNIT |
| Case(s) | 00195 | "BANDITOS" Lunch pk. VARIETY 12PK. ( 6&6 ) | 2 | ON CASE |
| Case(s) | 02195 | "BANDITOS" Lunch pk. VARIETY 6PK.  (3&3) | 3 | ON CASE |
|  | OTHER |  |  |  |

**How Shipped:** GROUND

**Customer:** SHIP TO:

SUE DARBY
1616 INDIAS SPRINGS LANE
BIRMINGHAM, AL. 35242
205-995-2267
\*\*SHE BOUGHT THE PRODUCT THAT WAS DELIVERED TO SAM'S, SHE SAID THE CHEESE
TASTED LIKE IT WAS BURNT.

**Date When Needed:**

*Dave  9-28-99*
**Broker**

SP002058

PROCESSED ON: 9/27/99    BY: LISA MILLER / SALES ASSISTANT

0029322
ACKNOWLEDGMENT

RUPARI FOOD SERVICES,INC.
1208 W. NEWPORT CENTER DR
SUITE 100
DEERFIELD BEACH FL 33442

RUPARI FOOD SERVICES,INC.
1287 E. NEWPORT CENTER DR
UNIT 206
DEERFIELD BEACH FL 33442

RU500     50   2183-2187    UPS GROUND     09/27/99  Net 10          09/27/99    1

Acknowledgment of order received, not an Invoice

| | | | | | |
|---|---|---|---|---|---|
| 12 | 12 | 00154 | BANDITOS 6PK VARIETY PK | 5.43 | 65.16 |
| | | | REQ. SHIP DATE 09/27/99 | | |
| 14 | 14 | 00155 | 12/6 2 OZ CHIPS/SALSA | 8.80 | 123.20 |
| | | | REQ. SHIP DATE 09/27/99 | | |
| 14 | 14 | 00156 | 12/6 2 OZ CHIPS/NACHO CHE | 8.80 | 123.20 |
| | | | REQ. SHIP DATE 09/27/99 | | |
| 19 | 19 | 00175 | BANDITOS JR 12PK SALSA | 6.75 | 128.25 |
| | | | REQ. SHIP DATE 09/27/99 | | |
| 19 | 19 | 00176 | BANDITOS JR 12PK CHEESE | 6.75 | 128.25 |
| | | | REQ. SHIP DATE 09/27/99 | | |
| 12 | 12 | 00195 | BANDITOS VARIETY KIDS PK | 7.95 | 95.40 |
| | | | REQ. SHIP DATE 09/27/99 | | |
| 14 | 14 | MISCSALES | MISC ACCTS RECEIVABLE | 0.36 | 5.04 |
| | | | REQ. SHIP DATE 09/27/99 | | |
| | | | CHARGE FOR BOXES USED FOR | | |
| | | | SHIPPING: 14 @ .36/EA. | | |
| | | | SAMPLES SHIPPED UPS GRND | | |
| | | | PO#2183,2184,2185,2186 | | |
| | | | AND PO#2187 | | |

**SP002059**

668.50

0.00

668.50

SOURCE    RUPARI

09/21/1999  09:36                                    NO. 748  003

*RICK - OLD*
*SAMPLE*

*Rick 9/23*

**TODAYS DATE**
| 9/3/99 |

**\*\*PLEASE REFRENCE THIS**
**NUMBER ON INVOICES**
| 2183 |

| Sample Request Form |

**Broker:**  KEVIN O'LOUGHLIN
HOGAN DINING CNTR.
1 COLLEGE ST.
WORCHESTER, MA. 01610
508-793-2270

**Product to be Shipped:**

| | | Product | COUPON # | where at on Pkg. |
|---|---|---|---|---|
| Case(s) | 00154 | "BANDITOS" 6pk. ( 3 cheese & 3 salsa ) | | |
| Case(s) | 00155 | "BANDITOS" 12pk. CHIPS-N-SALSA | | |
| Case(s) | 00156 | "BANDITOS" 12pk. CHIPS-N-NACHO CHEESE | | |
| 1 Case(s) | 00175 | "BANDITOS" Lunch pk. 12pk. CHIPS-N-SALSA | 5 | each unit |
| 1 Case(s) | 00176 | "BANDITOS" Lunch pk. 12pk. CHIPS-N-NACHO CHEESE | 5 | each unit |
| Case(s) | 00195 | "BANDITOS" Lunch pk. VARIETY 12PK. ( 6&6 ) | | |
| | OTHER | | | |

*also w/yellow Ball offer*

**How Shipped:**  GROUND

**NOTE:**          ALSO MAKE SURE SAMPLES HAVE YELLOW
FREE BALL OFFER ON THEM TOO.

**Date When Needed:**

*this guy has*
*still not Rec.*
*this Sample*
*Req. Please*
*Inform.*

**Broker**

*978-683-9536*
*Bob Nastasici*
*6-6*

SP002060

PROCESSED ON: 9/3/99    BY: LISA MILLER / SALES ASSISTANT



**TODAYS DATE**
9/3/99

**\*\*PLEASE REFRENCE THIS NUMBER ON INVOICES**
2183

### Sample Request Form

**Broker:** KEVIN O'LOUGHLIN
HOGAN DINING CNTR.
1 COLLEGE ST.
WORCHESTER, MA. 01610
508-793-2270

| Product to be Shipped: | | | COUPON # | where at on Pkg. |
|---|---|---|---|---|
| Case(s) | 00154 | "BANDITOS" 6pk. ( 3 cheese & 3 salsa ) | | |
| Case(s) | 00155 | "BANDITOS" 12pk. CHIPS-N-SALSA | | |
| Case(s) | 00156 | "BANDITOS" 12pk. CHIPS-N-NACHO CHEESE | | |
| 1 Case(s) | 00175 | "BANDITOS" Lunch pk. 12pk. CHIPS-N-SALSA | 5 | each unit |
| 1 Case(s) | 00176 | "BANDITOS" Lunch pk. 12pk. CHIPS-N-NACHO CHEESE | 5 | each unit |
| Case(s) | 00195 | "BANDITOS" Lunch pk. VARIETY 12PK. ( 6&6 ) | | |
| | OTHER | | | |

**How Shipped:** GROUND

**NOTE:** ALSO MAKE SURE SAMPLES HAVE YELLOW
: FREE BALL OFFER ON THEM TOO.
:
:
:
:
:

**Date When Needed:**

_____
**Broker**

**SP002061**

PROCESSED ON 9/3/99    BY: LISA MILLER / SALES ASSISTANT

*Rich 9/23*

| | |
|---|---|
| **TODAYS DATE** | **\*\*PLEASE REFRENCE THIS** |
| 9/21/99 | **NUMBER ON INVOICES** |
| | 2184 |

### Sample Request Form

**Broker:**  R & A FOOD SERVICE
BOB NASTASIA
26 TRINITY CT.
N. ANDOVER , MA. 01845
978-683-9536

**Product to be Shipped:**

| | | | COUPON # | where at on Pkg. |
|---|---|---|---|---|
| 2 Case(s) | 00154 | "BANDITOS" 6pk.  ( 3 cheese & 3 salsa ) | 3 | ON CASE |
| 2 Case(s) | 00155 | "BANDITOS" 12pk. CHIPS-N-SALSA | 1 | each unit |
| 2 Case(s) | 00156 | "BANDITOS" 12pk. CHIPS-N-NACHO CHEESE | 1 | each unit |
| 4 Case(s) | 00175 | "BANDITOS" Lunch pk. 12pk. CHIPS-N-SALSA | 5 | each unit |
| 4 Case(s) | 00176 | "BANDITOS" Lunch pk. 12pk. CHIPS-N-NACHO CHEESE | 5 | each unit |
| 2 Case(s) | 00195 | "BANDITOS" Lunch pk. VARIETY 12PK. ( 6&6 ) | 5 | each unit |
| 1 | OTHER | wire rack ( sent from rupari) | | |

*also w/ yellow bill coupon*

**How Shipped:**  GROUND

**Customer:**           PRESENTING TO:
:
:          NEW ACCOUNTS
:
:
:
:
:
:

**Date When Needed:**

**Broker**

SP002062

*PROCESSED ON: 9/21/99    BY: LISA MILLER / SALES ASSISTANT*

*Kich 4125*

**TODAYS DATE**

| 9/22/99 |

**\*\*PLEASE REFRENCE THIS NUMBER ON INVOICES**

| 2185 |

| Sample Request Form |

**Broker:**  A & D SALES
DAVID BYE
550 SMITH TOWN BYPASS  #204
SMITH TOWN, NY. 11787

**Product to be Shipped:**

| | | | COUPON # | where at on Pkg. |
|---|---|---|---|---|
| Case(s) | 00154 | "BANDITOS" 6pk.  ( 3 cheese & 3 salsa ) | | |
| 2 Case(s) | 00155 | "BANDITOS" 12pk. CHIPS-N-SALSA | 4 | EACH UNIT |
| 2 Case(s) | 00156 | "BANDITOS" 12pk. CHIPS-N-NACHO CHEESE | 4 | EACH UNIT |
| 2 Case(s) | 00175 | "BANDITOS" Lunch pk. 12pk. CHIPS-N-SALSA | 5 | EACH UNIT |
| 2 Case(s) | 00176 | "BANDITOS" Lunch pk. 12pk. CHIPS-N-NACHO CHEESE | 5 | EACH UNIT |
| Case(s) | 00195 | "BANDITOS" Lunch pk. VARIETY 12PK. ( 6&6 ) | | |
| | OTHER | | | |

*yellow Ball coupon also*

**How Shipped:**  GROUND

**Customer:**        PRESENTING TO:

**Date When Needed:**

**Broker**

**SP002063**

PROCESSED ON: 9/22/99    BY: LISA MILLER / SALES ASSISTANT

**TODAYS DATE**
9/22/99

**\*\*PLEASE REFRENCE THIS NUMBER ON INVOICES**
2186

### Sample Request Form

**Broker:**  RUPARI FOOD SERVICE
LISA MILLER
1208 W. NEWPORT CENTER DR.
SUITE #200
DEERFIELD BEACH, FL. 33442

**Product to be Shipped:**

| | | | Product | COUPON # | where at on Pkg. |
|---|---|---|---|---|---|
| 10 | Case(s) | 00154 | "BANDITOS" 6pk. ( 3 cheese & 3 salsa ) | 3 | ON CASE |
| 10 | Case(s) | 00155 | "BANDITOS" 12pk. CHIPS-N-SALSA | 4 | EACH UNIT |
| 10 | Case(s) | 00156 | "BANDITOS" 12pk. CHIPS-N-NACHO CHEESE | 4 | EACH UNIT |
| 10 | Case(s) | 00175 | "BANDITOS" Lunch pk. 12pk. CHIPS-N-SALSA | 5 | EACH UNIT |
| 10 | Case(s) | 00176 | "BANDITOS" Lunch pk. 12pk. CHIPS-N-NACHO CHEESE | 5 | EACH UNIT |
| 10 | Case(s) | 00195 | "BANDITOS" Lunch pk. VARIETY 12PK. ( 6&6 ) | 2 | ON CASE |
| 10 | Case(s) | 02195 | "BANDITOS" Lunch pk. VARIETY 6PK. (3&3) | 3 | ON CASE |
| | | OTHER | | | |

*also yellow Bell Coupon*

**How Shipped:**  GROUND  WANT TO HAVE HERE BY:WED./THURS. NEXT WEEK ? PLEASE

**Customer:**  PRESENTING TO:

IN OFFICE SAMPLES NEEDED

**Date When Needed:**

**Broker**

**SP002064**

PROCESSED ON: 9/22/99  BY: LISA MILLER / SALES ASSISTANT

*c.c. Rick 9-24-99*

**TODAYS DATE**

9/23/99

**\*\*PLEASE REFRENCE THIS NUMBER ON INVOICES**

2187

**Sample Request Form**

| **Broker:** | RUPARI FOODS |
|---|---|

| **Product to be Shipped:** | | | COUPON # | where at on Pkg. |
|---|---|---|---|---|
| Case(s) | 00154 | "BANDITOS" 6pk.  ( 3 cheese & 3 salsa ) | 3 | ON CASE |
| Case(s) | 00155 | "BANDITOS" 12pk. CHIPS-N-SALSA | 4 | EACH UNIT |
| Case(s) | 00156 | "BANDITOS" 12pk. CHIPS-N-NACHO CHEESE | 4 | EACH UNIT |
| 2 Case(s) | 00175 | "BANDITOS" Lunch pk. 12pk. CHIPS-N-SALSA | 75¢ 5 off | EACH UNIT |
| 2 Case(s) | 00176 | "BANDITOS" Lunch pk. 12pk. CHIPS-N-NACHO CHEESE | 75¢ 5 off | EACH UNIT |
| Case(s) | 00195 | "BANDITOS" Lunch pk. VARIETY 12PK. ( 6&6 ) | 2 | ON CASE |
| Case(s) | 02195 | "BANDITOS" Lunch pk. VARIETY 6PK.  (3&3) | 3 | ON CASE |
| | OTHER | | | |

| **How Shipped:** | NEED TO BE @ ADDRESS BY 9/28/99 ( TUESDAY) |
|---|---|

| **Customer:** | SEND TO: |
|---|---|

NACS SHOW

C/O: SALLY PETERSON

17237 FOXGROVE LANE

TINLEY PARK, IL. 60477

| **Date When Needed:** | MUST ARRIVE BY 9/28/99 PLEASE !!! |
|---|---|

**Broker**

SP002065

PROCESSED ON: 9/23/99    BY: LISA MILLER / SALES ASSISTANT

RUPARI FOOD SERVICES.INC.          RUPARI FOOD SERVICES.INC.
1208 W. NEWPORT CENTER DR          1208 W. NEWPORT CENTER DR
SUITE 102                          UNIT 102
DEERFIELD BEACH FL 33442           DEERFIELD BEACH FL 33442

500    50   2179-2132   UPS GROUND      07/21/99   Net 12          09/01/99   1

Acknowledgment of order received. not an Invoice

        4        4 22175      BANDITOS VARIETY KING PK      7.95         31.80
                              REQ. SHIP DATE 07/21/99

                                                                    31.80

                                                                    -8.00

**SP002066**                  31.80

**TODAYS DATE**
9/1/99

**"PLEASE REFRENCE THIS NUMBER ON INVOICES**
2179

## Sample Request Form

**Broker:** TOSCO
JASON BROUSSARD
3645 SOUTHERN AVE
SHREVESPORT, LA  71104

| Product to be Shipped: | | | COUPON # | where at on Pkg. |
|---|---|---|---|---|
| Case(s) | 00154 | "BANDITOS" 6pk.  ( 3 cheese & 3 salsa ) | | |
| Case(s) | 00155 | "BANDITOS" 12pk. CHIPS-N-SALSA | | |
| Case(s) | 00156 | "BANDITOS" 12pk. CHIPS-N-NACHO CHEESE | | |
| Case(s) | 00175 | "BANDITOS"  Lunch pk. 12pk. CHIPS-N-SALSA | | |
| Case(s) | 00176 | "BANDITOS"  Lunch pk. 12pk. CHIPS-N-NACHO CHEESE | | |
| 1  Case(s) | 00195 | "BANDITOS"  Lunch pk. VARIETY 12PK. ( 6&6 ) | 5 | each unit |
| | OTHER | | | |

**How Shipped:**   GROUND

**Customer:**        PRESENTING TO:

PER - PETE C.

**Date When Needed:**

**Broker**

SP002067

PROCESSED ON: 9/1/99    BY: LISA MILLER / SALES ASSISTANT

TODAYS DATE

| 9/1/99 |

**PLEASE REFRENCE THIS
NUMBER ON INVOICES

| 2180 |

### Sample Request Form

| Broker: | TOSCO |
| | DAN COSITORE |
| | 5650 BRECKENRIDGE PK DR.    SUITE # 300 |
| | TAMPA, FL. 33610 |

| Product to be Shipped: | | | COUPON # | where at on Pkg. |
|---|---|---|---|---|
| Case(s) | 00154 | "BANDITOS" 6pk.  ( 3 cheese & 3 salsa ) | | |
| Case(s) | 00155 | "BANDITOS" 12pk. CHIPS-N-SALSA | | |
| Case(s) | 00156 | "BANDITOS" 12pk. CHIPS-N-NACHO CHEESE | | |
| Case(s) | 00175 | "BANDITOS" Lunch pk. 12pk. CHIPS-N-SALSA | | |
| Case(s) | 00176 | "BANDITOS" Lunch pk. 12pk. CHIPS-N-NACHO CHEESE | | |
| 1  Case(s) | 00195 | "BANDITOS"  Lunch pk. VARIETY 12PK. ( 6&6 ) | 5 | each unit |
| | OTHER | | | |

| How Shipped: | GROUND |

| Customer: | PRESENTING TO: |
| : | |
| : | PER  - PETE C. |
| : | |
| : | |
| : | |
| : | |
| : | |
| : | |

| Date When Needed: |

Broker

SP002068

PROCESSED ON: 9/1/99    BY: LISA MILLER / SALES ASSISTANT

TODAYS DATE
**9/1/99**

**PLEASE REFRENCE THIS
NUMBER ON INVOICES
2181

### Sample Request Form

**Broker:** TOSCO

TOM FARNHAM

495 E. RICON

SUITE # 150

CORONA , CA. 91719

**Product to be Shipped:**

| | | | COUPON # | where at on Pkg. |
|---|---|---|---|---|
| Case(s) | 00154 | "BANDITOS" 6pk. ( 3 cheese & 3 salsa ) | | |
| Case(s) | 00155 | "BANDITOS" 12pk. *CHIPS-N-SALSA* | | |
| Case(s) | 00156 | "BANDITOS" 12pk. *CHIPS-N-NACHO CHEESE* | | |
| Case(s) | 00175 | "BANDITOS" Lunch pk. 12pk. *CHIPS-N-SALSA* | | |
| Case(s) | 00176 | "BANDITOS" Lunch pk. 12pk. *CHIPS-N-NACHO CHEESE* | | |
| 1 Case(s) | 00195 | "BANDITOS" Lunch pk. VARIETY 12PK. ( 6&6 ) | 5 | each unit |
| | OTHER | | | |

**How Shipped:** GROUND

**Customer:** PRESENTING TO:

PER - PETE C.

**Date When Needed:**

**Broker**

**SP002069**

PROCESSED ON: 9/1/99    BY: LISA MILLER / SALES ASSISTANT

TODAYS DATE
**9/1/99**

**Sample Request Form**

\*\*PLEASE REFRENCE THIS
NUMBER ON INVOICES
**2182**

**Broker:** TOSCO
GREG DEAN
1500 N. PRIEST DR.
TEMPE, AZ. 85281
602-728-3756

| Product to be Shipped: | | | COUPON # | where at on Pkg. |
|---|---|---|---|---|
| Case(s) | 00154 | "BANDITOS" 6pk.  ( 3 cheese & 3 salsa ) | | |
| Case(s) | 00155 | "BANDITOS" 12pk. CHIPS-N-SALSA | | |
| Case(s) | 00156 | "BANDITOS" 12pk. CHIPS-N-NACHO CHEESE | | |
| Case(s) | 00175 | "BANDITOS" Lunch pk. 12pk. CHIPS-N-SALSA | | |
| Case(s) | 00176 | "BANDITOS" Lunch pk. 12pk. CHIPS-N-NACHO CHEESE | | |
| 1 Case(s) | 00195 | "BANDITOS" Lunch pk. VARIETY 12PK. ( 6&6 ) | 5 | each unit |
| | OTHER | | | |

**How Shipped:** GROUND

**Customer:**        PRESENTING TO:

:
:        PER - PETE C.
:
:
:
:
:

**Date When Needed:**

**Broker**

SP002070

# RUPARI
## FOOD SERVICES, INC.

**PURCHASE ORDER**



1208 West Newport Center Drive • Suite 100 • Deerfield Beach, FL 33442
TEL: (305) 480-6320 • FAX: (305) 480-6367

| VENDOR | | |
|---|---|---|
| SPARTA FOODS | | |
| 1565 1ST AVENUE NW | | |
| NEW BRIGHTON , MN 55112 | 4134 | 05/17/99 |

| LINE NO. | QUANTITY | CODE | DESCRIPTION | UNIT PRICE | EXTENSION |
|---|---|---|---|---|---|
| 1 | 252.0 | 100156 | BANDITOS CHEESE | 10.09 | 2540.16 |
| 2 | 252.0 | 100155 | BANDITOS SALSA | 10.09 | 2540.16 |

*(SHIP 5002799 PRODUCT PER CARLO 5/17)*

## P.O. # MUST APPEAR
## ON INVOICE OR IT
## WILL BE RETURNED UNPAID

**Affidavit of J. Bachul**
**EXHIBIT D**

**TOTAL $** 5,080.32

SPECIAL INSTRUCTIONS:

WINN DIXIE
DELIVER TO: W/D LOUISVILLE
720 LOCUST LANE, LOUISVILLE KY
40313....589-635-0333

SP003082

# RUPARI
## FOOD SERVICES, INC.

**PURCHASE ORDER**

1208 West Newport Center Drive • Suite 100 • Deerfield Beach, FL 33442
TEL: (305) 480-6320 • FAX: (305) 480-6367

VENDOR

SPARTA FOODS, INC.
1565 1ST AVENUE NW
NEW BRIGHTON    , MN  55112

| | |
|---|---|
| 4440 | 08/31/99 |
| 0 LOCATION NOT INPUT | 10-03-1999 |

*PLS CANCEL THNKS, TOM* (handwritten)

| CONTRACT | COUNTRY | VESSEL |
|---|---|---|
| B/L NUMBER | CONTAINER NUMBER | CUSTOMER BROKER | FREIGHT FWDER |

| LINE NO. | QUANTITY | CODE | DESCRIPTION | UNIT | EXTENSIONS |
|---|---|---|---|---|---|
| 1 | 32.0 | 100164 | 72 PK DISPLAY (36&36) | 69.98 | 2239.36 |

*PLS CANCEL THNKS, TOM* (handwritten)

*CKW called for Tom 9/24  Will advise...* (handwritten)

*8/Plt  46#/cs* (handwritten)

**P.O. # MUST APPEAR ON INVOICE OR IT WILL BE RETURNED UNPAID**

*CANCELLED 9/29/99* (handwritten)

Order Approval:

| | |
|---|---|
| **TOTAL $** | 2,239.36 |

SPECIAL INSTRUCTIONS:

ASSOCIATED GROCERS OF S FLA
7000 NW 32nd AVE DUE 10-4
MIAMI, FL 33147 PO#20532A

SP003000

# THE TASTE OF OLE MEXICO



**RUPARI
FOODSERVICES, INC**
1208 W. NEWPORT
CENTER DR.
SUITE #200
DEERFIELD BEACH, FL.
33442
(954)-480-9110ph
(954)480-6974fx

# Fax

| | | |
|---|---|---|
| **To:** Jean @ Sparta | **From:** LISA MILLER | |
| **Fax:** 651·697·0484 | **Pages:** 52   **INCL COVER** | |
| **Phone** | **Date:** 7 26/99 | |
| **Re:** | **CC:** | |

☐ Urgent    X For Review    X Please Comment    X Please Reply    ☐ Please Recycle

● **Comments:**

Please call to confirm
51 orders
PO#'s 2117 thru 2167

thanks

SINCERELY,

LISA MILLER
SALES ASSISTANT

RUPARI
WANTS
175 & 176
WHENEVER
WE CAN

2135
175 Delete
176 L
195 Pkup
156
155

164 - 2

(B-2)
A-2 11

SP003055



# EXHIBIT E

**[Rupari's Banditos™ Chips & Nacho Cheese shipping case]**

**[Rupari's Banditos™ Chips & Salsa shipping case]**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Sparta Foods, Inc.,

               Plaintiff,

v.

Rupari Food Services, Inc.,

               Defendant.

Court File No. 99-CV-2041
(MJD/JGL)

**AFFIDAVIT OF
A. MERRILL AYERS**

STATE OF MINNESOTA  )
                     ) SS.
COUNTY OF HENNEPIN  )

    A. Merrill Ayers, being first duly sworn on oath, deposes and says as follows:

    1.    I am the Senior Vice President of Finance and Administration of Sparta Foods, Inc. ("Sparta"), the plaintiff in this action. As such, I am the custodian of Sparta's business records kept in the ordinary course of business.

    2.    Pursuant to the Supply Agreement between Sparta and defendant Rupari Food Services, Inc. ("Rupari"), Sparta sold and delivered Rupari's "Banditos" chips/cheese and chips/salsa food products to the Minnesota customers listed on Exhibit A to my affidavit, attached hereto and made a part hereof as though fully set forth at this point.

    3.    Pursuant to the Supply Agreement between Sparta and defendant Rupari, Rupari ordered approximately $200,000 of the Banditos product from Sparta.

    Further affiant saith not, save and except that this affidavit is made in support of Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss.

_A. Merrill Ayers_

A. Merrill Ayers

Subscribed and sworn to before me
this _17th_ day of February, 2000.

_Ann N. Chupita_

Notary Public
~~Hennepin County, MN~~



ANN N. CHUPITA
NOTARY PUBLIC - MINNESOTA
RAMSEY COUNTY
My Commission Expires
January 31, 2005

Exhibit A to Affidavit of A. Merrill Ayers

| Customer | Cases | Invoice Date | Invoice Number | $ Received |
|---|---|---|---|---|
| Cenex | 126 | 12-1-99 | 0076561 | 1,134.00 |
| Harvest States | 90 | 6-29-99 | 0074171 | 1,069.20 |
| Roxanne Johnson | 1 | 4-29-99 | 0073315 | 23.88 |
| Michael Nagel | 1 | 4-22-99 | 0073180 | 23.88 |
| Dennie LaValle | 1 | 4-22-99 | 0073179 | 23.88 |
| Aaron Howe | 1 | 4-22-99 | 0073178 | 23.88 |
| Peter Hitch | 1 | 8-3-99 | 0074700 | 23.88 |
| Craig Cram | 8 | 3-5-99 | 0072391 | 80.00 |
| Brightwood Hill Golf Centers | 6 | 7-28-99 | 0074565 | 86.40 |
|  | 6 | 5-17-99 | 0073552 | 86.40 |
|  | 5 | 4-28-99 | 0073292 | 72.00 |
| Cub Foods – Elk River | 25 | 3-29-99 | 0072832 | 232.20 |
|  | 20 | 4-13-99 | 0073050 | 309.60 |
| Cub Foods – Woodbury | 30 | 3-26-99 | 0072813 | 309.60 |
| Cub Foods – Knollwood | 126 | 4-14-99 | 0073069 | 1,950.48 |
| MN State HS Debate Tourney | 6 | 12-29-99 | 0077027 | 46.08 |
| TNT Vending | 6 | 3-26-99 | 0072809 | 90.00 |
|  | 4 | 3-5-99 | 0072392 | 60.00 |
| Coborn's Inc. | 200 | 6-2-99 | 0073796 | 1,800.00 |
| Draper Foods | 40 | 4-6-99 | 0072969 | 504.00 |
| Henri's Foods Inc. | 441 | 4-21-99 | 0073166 | 6,121.08 |
| Impact Vending | 80 | 4-30-99 | 0073326 | 1,056.00 |
| Interstate Brands | 252 | 6-9-99 | 0073904 | 2,872.80 |
| Prinsen Distributing, Inc. | 90 | 10-26-99 | 0076023 | 1,456.56 |
|  | 102 | 8-30-99 | 0075125 | 1,285.20 |
| PYA Monarch | 14 | 6-21-99 | 0074044 | 176.40 |
| R.E. Fritz, Inc. | 56 | 5-27-99 | 0073726 | 777.28 |
|  | 28 | 5-4-99 | 007330 | 388.64 |
|  | 16 | 4-22-99 | 0073177 | 222.08 |
|  | 252 | 4-15-99 | 0073080 | 3,497.76 |
| Sandstrom's | 756 | 3-24-99 | 0072773 | 11,199.28 |
| Shakopee Dakota Conv. Store | 6 | 9-23-99 | 0075555 | 83.28 |
| U of M Duluth | 86 | 5-13-99 | 0073495 | 1,124.88 |
| Upper Lakes Foods | 20 | 4-19-99 | 0073105 | 352.00 |

| Voyager Vending | 80 | 4-30-99 | 0073327 | 1,034.88 |
|---|---|---|---|---|
| | 17 | 4-23-99 | 0073193 | 219.91 |
| | 7 | 4-16-99 | 0073098 | 90.55 |
| | 16 | 4-9-99 | 0073010 | 206.98 |
| | 26 | 3-31-99 | 0072889 | 336.98 |
| | | | | $40,451.90 |